**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-6513**

---

JEREMIAH ANTOINE SWEENEY,

Petitioner - Appellant,

v.

RICHARD J. GRAHAM, JR., Warden, Western Correctional Institution; ANTHONY G. BROWN, Maryland Attorney General,

Respondents - Appellees.

---

Appeal from the United States District Court for the District of Maryland, at Greenbelt. Paul W. Grimm, Senior Judge. (8:19-cv-01289-PWG)

---

Argued: September 26, 2024                    Decided: March 13, 2025

---

Before GREGORY and QUATTLEBAUM, Circuit Judges, and Terrence W. BOYLE, United States District Judge for the Eastern District of North Carolina, sitting by designation.

---

Reversed and remanded with instructions by unpublished opinion. Judge Gregory wrote the opinion, in which Judge Boyle joined. Judge Quattlebaum wrote a dissenting opinion.

---

**ARGUED:** Michael James Confusione, HEGGE & CONFUSIONE, LLC, Mullica Hill, New Jersey, for Appellant. Andrew John DiMiceli, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Anthony G. Brown, Attorney General, Criminal Appeals Division, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

GREGORY, Circuit Judge:

This is a murder case in which Defendant Jeremiah Sweeney invoked his constitutional right to a jury trial. At that jury trial, his defense attorney Justin Nunzio presented no evidence and called no witnesses. The government's case was built on eyewitness testimony placing Sweeney as the shooter—late at night, on a crowded street, and with Sweeney almost a football field's length away from the decedent. Vantage point was an issue; light was an issue; Sweeney's position and the angle of the decedent's bullet wound was an issue. The jury was presented with a diagram of the crime scene at trial. The murder weapon was never found. The government's burden to prove Sweeney guilty beyond a reasonable doubt balanced entirely on whether the jury believed the eyewitness testimony.

After the presentation of the evidence concluded but before the jury began its deliberations, Juror No. 4 visited the crime scene at night to "get an accurate view." The next day, after thirty-five minutes of deliberations, the judge was informed of Juror No. 4's unauthorized visit. After fifty-eight minutes, the jury was brought into the courtroom. Both the judge and Nunzio failed to sufficiently question Juror No. 4, and both failed to ask *any* questions of the other jurors. Instead, without knowing what other jurors specifically had been told, but despite there having been enough discussion that Juror No. 4 could state that the other jurors "would have no problem with basing their decision[] off of the evidence which was presented in the case," only Juror No. 4 was excused, and Sweeney was swiftly convicted by the potentially-tainted eleven-member jury.

2

The circumstances of this case—hopefully very rare to occur—undermine the essence of a jury trial as well as the burden of proof in our criminal system. Sweeney was entitled to a fair and impartial jury, reaching a verdict based solely on the evidence presented in the courtroom, and to a presumption of innocence unless and until the government met its burden of proving him guilty beyond a reasonable doubt. Here, Juror No. 4 had some doubt, so he went to the crime scene at night to get "an actual visual" and walk through the area. But Juror No. 4's doubt should not have been resolved by anything seen or heard outside the courtroom, and the government should have been held to its burden based on the evidence presented at trial.

Juror No 4's actions were just the tip of the iceberg: Judge and defense counsel both failed in their responsibilities. The trial court judge did not properly inquire into the jury taint. Nunzio rendered representation far short of what is objectively reasonable. The breakdown of the judicial process in this case—from juror to judge to attorney—deprived Sweeney of his constitutional rights, and he is therefore entitled to a new trial. We reverse the district court's denial of Sweeney's petition.

I.

Jeremiah Sweeney was charged with eleven counts related to an April 2010 murder in Prince George's County, Maryland. J.A. 14, 274, 443. Represented by attorney Justin Nunzio, Sweeney chose to proceed to a jury trial in June 2011 before the state circuit court. J.A. 5, 14. During preliminary instructions, the trial court judge

3

instructed the jurors to not conduct research or investigation into the case on their own. J.A. 462.

Over four days, the government presented its case through sixteen witnesses. J.A. 313. The defense did not present any witnesses nor evidence. *See* J.A. 79.

Numerous government witnesses testified that Sweeney had been arguing with neighbors about stolen marijuana; he then opened fire, missing his intended targets and instead fatally wounding a bystander from approximately seventy-five yards away, across a street with parking on both sides. J.A. 16–17, 224; *see also* Opening Br. at 22. The government admitted into evidence a diagram of the crime scene that had been discussed by numerous witnesses, published to the jury, and discussed during closing argument. *See* J.A. 183. All witnesses testified that the murder weapon was a black gun, J.A. 146, but the government never produced the murder weapon, J.A. 17, *see also* Opening Br. at 2 n.1. Only one government witness testified to seeing Sweeney with a black gun, J.A. 17, and Nunzio had questioned the reliability of that witness' vision and memory on cross-examination, J.A. 114–15. A silver gun found in Sweeney's house was admitted into evidence by stipulation. J.A. 67–69. At trial, a firearms examiner testified that this silver gun could not have been used to fire the shell casings found at the crime scene. J.A. 68, 322.

On cross-examination, Nunzio elicited testimony that might have suggested a different shooter. He believed this testimony demonstrated that the decedent's bullet wound, which showed that the bullet entered the back of his head and exited the front, was not consistent with the angle where Sweeney was in relation to the decedent; rather, it was consistent with the position of another individual at the scene, David Walls. J.A. 91–92,

4

293. However, while some witnesses testified that they had seen Walls with a gun, *see* J.A. 318, 320, they testified that Walls did not shoot the decedent, J.A. 93. Furthermore, the firearms examiner testified that Walls' gun, which had been turned over, also could not have been used to fire the casings found at the scene. J.A. 322.

All in all, the government's case was built almost entirely on eyewitness testimony placing Sweeney as the shooter. As Nunzio later stated, "[t]he gun was never found and all the government had was [ ] statements from witnesses. There was no . . . 'forensic evidence' of the gun or the shell casings . . . . It was all testimony." J.A. 110.

In the evening of the fourth day of trial, after the government rested its case and before deliberations began, Juror Number 4 took an unauthorized visit to the crime scene. The morning of the fifth day, the judge excused the alternate jurors. J.A. 187–88. The jury began its deliberations shortly after 10:15 am. J.A. 188. Thirty-five minutes later, at 10:50 am, the judge received a note from the jury. J.A. 189. Fifty-eight minutes after deliberations began, at 11:13 am, the jury was brought into the courtroom, at which time the judge asked Juror No. 4 to approach the bench. J.A. 190. The rest of the jury remained in the courtroom. J.A. 84, 190. The record does not reflect whether the courtroom husher[1] was on, although the conversation appears to have occurred privately, albeit with the remaining jurors observing. *See* J.A. 84–85, 190. The following colloquy ensued:

> THE COURT:      I've got a note that says:

---

[1] A "husher" is a white-noise device that allows the discussion of sensitive, ex parte, or otherwise off-the-record information in a manner only heard by certain parties, in this instance likely the court, the attorneys, Sweeney, and Juror No. 4.

"Juror Number 4 went to the crime scene yesterday to walk through the scene and a couple of witnesses[2] were there. Is this okay? There was no interaction."

Tell me what happened.

JUROR NO. 4:    I just got out and went by the scene, just basically the crime scene, Your Honor. I just wanted to get a visual because I know – I see topographical views all the time and I know that that does not give an accurate – well, there's a better way to get an accurate view, which is to see a visual, an actual visual. And that's what I did. I spoke to no one.

THE COURT:    Is this in any way going to affect your –

JUROR NO. 4:    No, sir. Not at all.

THE COURT:    You can go back to your seat, please.

NUNZIO:    Your Honor, if I may?

Do any of the other jurors know that you went there?

JUROR NO. 4:    They do. But they stopped me, too, because they thought that I should stop talking and I present what I just said to you all.

NUNZIO:    As a result of that, if you were to go into deliberations, would you be able to deliberate based upon the facts here as opposed to what –

GOV'T ATT'Y:    What you saw?

NUNZIO:    – what you saw?

JUROR NO. 4:    That is correct. I would have no problem with basing my decision, and they would have no problem with basing their decision, off of the evidence which was presented in the case.

NUNZIO:    You know where I'm coming from?

---

[2] The witnesses whom Juror No. 4 indicated he saw were government witnesses, as the defense did not put on any witnesses. *See* J.A. 79.

6

| | |
|---|---|
| JUROR NO. 4: | Yes, sir.  Yes, sir. |
| THE COURT: | Thank you. |

J.A. 190–92.  This concluded the inquiry of Juror No. 4, and he at some point thereafter returned to the jury box.  *See* J.A. 195–96.

The parties then discussed options for moving forward:

| | |
|---|---|
| NUNZIO: | Does the Court have a preference? |
| GOV'T ATT'Y: | But do you want – I know that you were going through this before.  Do you want to take the entire jury and have them go through the neighborhood in conjunction with the Sheriff's Department? |
| NUNZIO: | Well, here is my problem – he can't help but tell them what he saw. |
| THE COURT: | I know.  I don't have a strong preferences [sic].  I mean, I can instruct – they know he went there. |
| GOV'T ATT'Y: | I would ask that a – in conjunction with the Sheriff's Department, that they would be allowed to go to the crime scene.  But not get out, not talk to anybody, but – |
| NUNZIO: | And if that's the only way to cure what you're – that's it. |
| THE COURT: | I'm not sure that's even doable. |
| NUNZIO: | We probably can't do it today. |
| THE COURT: | Well, and it requires a whole lot of effort. |
| NUNZIO: | Logistics. |
| GOV'T ATT'Y: | It won't be today, and it won't be before Monday. |
| NUNZIO: | And the Defense has no objection with that. |
| THE COURT: | I'm not sure that I can do it. |
| GOV'T ATT'Y: | Can we check with the Sheriff's Department? |

7

THE COURT:        I'll check. . . .

J.A. 192–93.  The court then told Nunzio to speak to his client, which he did for less than

two minutes.  J.A. 194.  Nunzio then reported to the court:

NUNZIO:        I posed three options to him.  He was very favorable – if this juror saw the scene, he would prefer all of them to take a look at the scene, if it's possible.  That way they have the same perspective as Juror Number 4 and that way they are all equal going back into the deliberation room.

GOV'T ATT'Y:   I think that's the best option.

THE COURT:     And if that's not possible, what?

NUNZIO:        Then I would probably just strike Juror Number 4.

[Some conversation regarding logistics omitted]

GOV'T ATT'Y:   . . . [I]f it's not a viable option [to visit the crime scene], maybe we should just strike Juror Number 4 from the pool.

THE COURT:     He is agreeable to that?

NUNZIO:        I think he would be.  He doesn't want to, but he would very, very much prefer everybody see what he saw.

J.A. 194–95.  The judge indicated that he would look into a potential crime scene visit.  He

then called Juror No. 4 back to the bench and instructed him to "not [ ] discuss anything that

happened during your tour of the crime scene. . . . Any experiences you had, that's not

something I want you to share with anybody else."  J.A. 195–96.  Juror No. 4 answered,

"Yes, sir."  J.A. 196.  Juror No. 4 then returned to the jury box with the rest of the jurors.  *Id.*

At 11:23 am, the judge then excused the jurors—including Juror No. 4—to the jury

lounge while the judge inquired with the Sheriff's Department about the potential crime

scene visit.  *Id.*; J.A. 86 (Maryland Circuit Court judge stating, "So now all twelve jurors

8

are in the jury lounge"); J.A. 382 (Sweeney's pro se petition for postconviction relief stating that "Juror #4 return[ed] to deliberation room after informing member of the jury about visiting the scene of the crime"); J.A. 490–91 (district court opinion stating that "The jury was excused and permitted to remain together in the jury lounge."); *but see* J.A. 82 (Nunzio testifying that he believed only "[t]he eleven" were together in the room). The attorneys and the judge acknowledged that the jurors would likely continue to talk about the case during the recess. They discussed:

| | |
|---|---|
| THE COURT: | They can talk. I don't know what else to do. |
| NUNZIO: | He can't be part of the process. |
| THE COURT: | I told him not to be sharing any of these experiences. |
| NUNZIO: | Absolutely right. While they are there they might as well do something. |
| GOV'T ATT'Y: | Instead of waiting around. |
| THE COURT: | Unless I put them in 12 different rooms. Well, I have one more thing to do and I will talk to the sheriff. |

J.A. 196–97. The judge never gave an instruction to the jurors not to deliberate during that time, nor an instruction to the eleven jurors to avoid discussing or considering anything Juror No. 4 had told them. The jurors were together in the jury lounge for approximately one hour and sixteen minutes.

The judge returned at approximately 12:39 pm. *See* J.A. 197.[3] He spoke with Sweeney off the record and asked if he wanted to proceed with eleven jurors and whether

---

[3] The record provided by the parties includes pages of a trial transcript that is excerpted in such a way that this conversation with Sweeney, which appears to be off-the-
(Continued)

he thoroughly discussed this with his lawyer, to which Sweeney replied affirmatively. J.A. 201. The judge also explained that Sweeney was giving up his right to a twelve-person jury, to which Sweeney again replied affirmatively. *Id.*; *see also* J.A. 89–90.

The court then brought the jury in at 12:41 pm. J.A. 201. The judge explained that "the ability of the sheriff to take the other jurors out there today is non-existent. We might be able to do it Monday, but I don't think that's realistic. We've already told this jury that this is a four-day event and we're already in day five." J.A. 197. The judge then called Juror No. 4 up to the bench and excused him. J.A. 198.

The judge then addressed the jury, telling them: "I'm going to excuse you for lunch right now. I'll ask you to please be back in one hour if you would. . . . [A]s I've excused Juror Number 4 – once all 11 of you are present, then you may begin your deliberations again." J.A. 198–99. The judge never instructed the remaining eleven jurors to not consider anything that Juror No. 4 had told them, nor anything else related to the potential taint.

The eleven-member jury reached a verdict after deliberating for approximately one hour and fifteen minutes. Opening Br. at 6; J.A. 204–214. Sweeney was convicted of second-degree murder, attempted second-degree murder, two counts of attempted first-degree murder, and four counts of use of a handgun in the commission of a crime of

---

record, begins mid-sentence; it is also unclear as to exactly when and in whose presence this conversation occurred. *See* J.A. 201; *see also* J.A. 197. The facts above include that which is reflected in the transcript.

10

violence. J.A. 356.[4] He was sentenced to two consecutive terms of life imprisonment plus thirty years. *Id.*

II.

After his conviction, Sweeney filed a direct appeal with the Maryland Court of Special Appeals. That court affirmed his conviction and sentence. J.A. 487. He then filed a petition for a writ of certiorari in the Maryland Court of Appeals, which denied his petition. *Id.*

Sweeney then filed a pro se petition for postconviction relief in the Maryland Circuit Court, in which he argued that his trial counsel, Nunzio, was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984), for: (1) failing to object to Juror No. 4 being allowed back into the deliberation room after advising the court he had visited the crime scene; (2) striking Juror No. 4 without his knowledge or consent; and (3) failing to explain to Sweeney his rights to twelve jurors or to declare a mistrial. J.A. 378–86. Sweeney was later appointed counsel who filed two supplements to the petition, raising additional claims for ineffective assistance of counsel, including some unrelated to Juror No. 4's unauthorized crime scene visit. J.A. 387–430 (Suppl. to Pet. for Post Conviction Relief); J.A. 431–42 (Second Suppl. to Pet. for Post Conviction Relief).

One of Sweeney's claims read: "Trial counsel rendered deficient assistance by choosing to proceed with an eleven[-]member jury without requesting *voir dire* of the

---

[4] Sweeney was found not guilty of first-degree murder and attempted murder, and the jury did not reach a verdict on any of the three counts of first-degree assault. J.A. 280.

remaining jurors regarding Juror Number 4's independent investigation of the crime scene or failing to request a mistrial." J.A. 432. It continued that "[i]t is incumbent upon competent counsel to ascertain the impact Juror Number 4's improper conduct had on the rest of the jury," but Nunzio instead "made the decision to move forward with an 11 member jury, essentially in a vacuum, without the information necessary to determine if that was sound strategy." J.A. 437. Sweeney also expressed concern with the court's excusal of Juror No. 4 to the jury lounge with the other jurors and the court's failure to instruct the other eleven jurors to not consider anything Juror No. 4 had told them. *See* J.A. 433–35. After briefing was filed, the Maryland Circuit Court held a postconviction review hearing. *See* J.A. 44.

At the hearing, Nunzio testified that when Juror No. 4 notified the court that he had gone to the crime scene the night before, it "[a]bsolutely" caused him some concern because the juror "wasn't paying attention to the Court rules" and "he went outside what the Court instructed him to do." J.A. 75. He testified that he "[c]ertainly" had concern about what Juror No. 4 had seen at the crime scene, particularly as some of the key issues at trial concerned the distance of certain buildings, the light at the scene at night, and the vantage point. J.A. 75–77. Nunzio admitted that he did not know what Juror No. 4 did at the scene, nor what the witnesses that Juror No. 4 saw were doing. J.A. 78.

Nunzio also testified as to the three options he presented Sweeney: (1) take all the jurors to the crime scene, (2) proceed with eleven jurors, or (3) move for a mistrial, the third of which was not reflected in the trial transcript. J.A. 80–81. He explained that he discussed these options with Sweeney and that he "did defer to [Sweeney]," but that it was

12

"almost a collective decision because the theory was if we had a juror who wasn't following the instructions from the Court as to admonishing them from doing an investigation, we didn't know if we could trust him to follow the rule of law as it was instructed by [the trial court judge]." J.A. 90. As for the option of a mistrial, Nunzio stated that:

> If I had to retry the case, I'd retry it. We talked about the jury pretty much extensively. Things were very good. The jurors seemed to be receptive as you watched them day after day. They were very attentive. There were things that came out of the trial that we both thought were very positive as far as the [alternative theory implicating Walls elicited during cross-examination.] So the theory was is [sic] that was going very well. Okay? And quite frankly, it was a shock to the prosecutor and to the ladies and gentleman of the jury. We were making headway. . . . But yes, we contemplated a mistrial. I don't know if we would have been able to replicate that scenario again, but we did talk about mistrial, but the theory was, and Sweeney acknowledged, we had made a lot of headway in the courtroom itself.

J.A. 90–93. Nunzio was asked if he had any concerns about reducing the number of jurors needed to reach a unanimous decision of conviction. J.A. 94. He answered, "do you think about it? Absolutely. But in this case, again, we were making headway inside the courtroom." *Id.* He discussed how on cross-examination he had highlighted inconsistencies between government witnesses. J.A. 94–95.

Government counsel asked Nunzio, "there was nothing that [Juror No. 4] said that would lead you to believe that his observations had in any way tainted the other jury members, was there?," to which he answered, "[t]hat's correct. . . . [I]f memory serves me, I mean [the trial court judge] asked the questions (indiscernible) and so forth. Memory serves me that the jury was not tainted as to what he said or did. . . . [T]here was no present-sense impression at that time and even until today that the jury was contaminated. I just – that's the way I feel and that's the way I did feel." J.A. 111–12; *see also* J.A. 117. When

13

asked to confirm that Juror No. 4 "did tell at least some jurors that he went to the scene" and "did in fact have some conversation with the jury," Nunzio answered that he would "defer to the record," referring to the trial transcript.  J.A. 118.

After the hearing, the Maryland Circuit Court denied Sweeney's petition for postconviction relief.  J.A. 452–53.  That court explained that Nunzio "discussed options with [Sweeney] on how to proceed," and that Sweeney "failed to produce evidence that Trial Counsel included the option to *voir dire sua sponte* the remaining eleven jurors, failing to meet his burden."  *Id.*  Sweeney then filed an application for leave to appeal in the Maryland Court of Special Appeals, *see* J.A. 455–81 (Appl. for Leave to Appeal Denial of Pet. for Post Conviction Relief), which denied his application per curiam.  J.A. 482–84. That court also denied his petition for writ of certiorari.  *See* J.A. 487.

Finally, with appointed counsel, Sweeney filed a petition under 28 U.S.C. § 2254 in the United States District Court for the District of Maryland.  *See generally* J.A. 4–39 (§ 2254 Petition).  In that petition, Sweeney argued that "[b]oth the court and Petitioner's attorney, Mr. Justin Nunzio, had a legal duty to determine the extent to which Juror Number 4 had been tainted by his visit to the crime scene and the other jurors had been tainted by their discussions with Juror Number 4."  J.A. 7.  He stated that Nunzio should have requested a voir dire of the entire jury, as this was "a protection against juror bias to which the petitioner had a right," and, furthermore, that this was "a protection that the court had an absolute duty on its own to provide."  J.A. 22.  Sweeney explained that the "trial court acted contrary to" what it was required to do when the judge (1) "failed to ask Juror Number 4 about the nature, the time, the duration, or the circumstances of the visit"; (2) did not

14

"hold a hearing to determine what Juror Number 4 had shared with the other jurors about the visit, or even how long he had spoken with the other jurors about that visit"; and (3) "allowed Juror Number Four to be part of the jury's deliberations for over an hour in the jury lounge." J.A. 24. He continued that these actions by the trial court judge—and Nunzio's failure to object to any of them—forced Sweeney to "decide . . . whether to waive [his] right to a twelve member jury[] without [ ] having the information reasonably necessary to make an informed decision," causing an injurious effect on his trial. *Id.* Additionally, he argued that the court's failure to conduct an inquiry of the jurors "denied [him] the opportunity to determine the extent of those injuries." *Id.*

The district court denied Sweeney's petition. It stated that Sweeney had "failed to bring a claim, either on direct appeal or in his application for postconviction review, that the trial court deprived him of the right to an impartial jury when it did not conduct a proper *Remmer* hearing," and he "thus couched his claim in his postconviction application and in the instant habeas Petition as ineffective assistance of counsel for failing to object to the trial court's failure to hold a proper *Remmer* hearing." J.A. 493 (referring to *Remmer v. United States*, 347 U.S. 227 (1954)). The court ultimately held that "the Circuit Court's application of *Strickland* was neither contrary to, nor an unreasonable application of, federal law and Sweeney's ineffective assistance of counsel claim fails." J.A. 496.

Sweeney then appealed to this Court. He again argued that "Sweeney's trial counsel rendered deficient performance under *Strickland* by failing to assert [his] right to a hearing and voir dire of the entire jury panel." Opening Br. at 13. He contended that "Sweeney's

15

right to a fair and impartial jury deliberations [sic] . . . was [ ] compromised by counsel's deficient performance." *Id.*

### III.

Generally speaking, "a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims." *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *see also* 28 U.S.C. § 2254(b)(1). But in some cases, it may be appropriate for courts to consider certain issues that have not been properly exhausted, and even do so sua sponte. The Supreme Court has explained that exhaustion "is not rigid and inflexible; [ ] courts may deviate from it and grant relief in special circumstances." *Frisbie v. Collins*, 342 U.S. 519, 521 (1952). As for acting sua sponte, courts have done so to address waiver of defenses or procedural defects, among other issues. For example, "if a full trial has been held in the district court and it is evident that a miscarriage of justice has occurred, it may [ ] be appropriate for the court of appeals to hold that the nonexhaustion defense has been waived in order to avoid unnecessary delay in granting relief that is plainly warranted." *Granberry v. Grer*, 481 U.S. 129, 135 (1987); *cf. Wood v. Milyard*, 566 U.S. 463, 472 (2012) (explaining that courts can consider sua sponte the timeliness of a habeas petition).

To be clear, "a federal court does not have *carte blanche* to depart from the principle of party presentation basic to our adversary system," *id.*, nor to create a workaround for exhaustion. But the court should "determine whether the interests of justice would be better served" by addressing underlying issues. *Granberry*, 481 U.S. at 136. If there exist

16

"special circumstances [that] require[] prompt federal intervention" in a particular case, the court should be able to act. *Frisbie*, 342 U.S. at 522. "Whether such circumstances exist calls for a factual appraisal by the court in each special situation," as "special circumstances" will be "peculiar to th[e] case, [and] may never come up again." *Id.* at 521–22.

The special circumstances of this case, which will likely never arise again,[5] require our consideration of an issue not cleanly articulated and exhausted by Sweeney.

This case is extraordinary in its significant breakdown of the judicial process. It began with Juror No. 4 taking an unauthorized visit to the crime scene the night before deliberations began, in direct violation of the court's orders, to get a more accurate view of the scene. Juror No. 4 then told the other jurors about his visit. The trial court judge failed to sufficiently inquire about Juror No. 4's visit to the crime scene. The judge failed to ask at all about what Juror No. 4 had told the other jurors. And the judge failed to speak to any of the other jurors themselves. Despite this, the judge allowed Juror No. 4 to return to the jury lounge with the other jurors for over an hour, with no instruction that they not deliberate. After ultimately excusing Juror No. 4, the judge never instructed the remaining eleven jurors that they were not to consider anything Juror No. 4 had told them. As for Sweeney's attorney, Nunzio, he likewise failed to sufficiently inquire into the jury's

---

[5] It would be a damning indictment of this nation's legal system if trials are being so mishandled in more than the extremely rare case. *Cf. Fields v. Fed. Bur. of Prisons*, 109 F.4th 264, 272 (4th Cir. 2024) ("If the officers' conduct alleged here is a frequent occurrence in prisons across the country, it would be a telling indictment of the American carceral system.").

17

impartiality.  Nunzio also failed to demand that the court conduct the hearing to which Sweeney was entitled in order to probe into the jury taint.  And instead of moving for a mistrial, Nunzio chose to proceed with an eleven-person jury in a murder trial, where he had presented no evidence nor witnesses, and without any information about the potential taint of those eleven jurors.  As a result, Sweeney was quickly convicted by an eleven-person jury and is now serving life in prison.  This breakdown—from juror, to judge, to defense attorney—deprived Sweeney of his constitutional rights.  Like a game of Jenga, one or two pieces can often be removed without causing collapse, but when multiple pieces fundamental to our trial system are pulled out from under a criminal defendant, justice topples entirely.

As previewed above, the problems in this case extend beyond the ineffective assistance of counsel, which is how Sweeney has articulated his claim, because many were caused by the judge's own failures to ensure the impartiality of Sweeney's jury.  Sweeney identified many of these failures throughout his various filings at the state and federal court levels.  For example, he indicated that the judge should have:  held an evidentiary hearing into what Juror No. 4 had seen during his crime scene visit and what he had shared with the other jurors, *see, e.g.*, J.A. 7, 24 (§ 2254 Petition); conducted an inquiry of the other eleven jurors, *see, e.g.*, J.A. 22 (§ 2254 Petition), 436–37 (Second Suppl. to Pet. for Post Conviction Relief); ensured that Juror No. 4 could not convey additional information to the other jurors by not allowing him to recess with them in the jury lounge, *see, e.g.*, J.A. 24, 33 (§ 2254 Petition), 435 (Second Suppl. to Pet. for Post Conviction Relief); and instructed the remaining eleven jurors not to consider anything Juror No. 4 had told them, *see, e.g.*,

18

J.A. 435 (Second Suppl. to Pet. for Post Conviction Relief).  Nunzio's deficiency in representation was exacerbated by the judge's own shortcomings in failing to protect Sweeney's constitutional rights.

Due to the combination of extraordinary failures from juror to judge to attorney, these "special circumstances . . . require[] prompt federal intervention" where it may otherwise be unavailable.  *Frisbie*, 342 U.S. at 522.  It is this multitude of failures that, together, take this case beyond our traditional habeas review.

### IV.

At our nation's founding, the right to a trial by jury was, along with representative government, considered "the heart and lungs" of liberty.  Letter from Clarendon to W. Pym (Jan. 27, 1766), *reprinted in* 1 *Papers of John Adams* 169 (R. Taylor ed. 1977).  This right was paramount to the Framers and chief among the protections afforded by state constitutions.  *See Erlinger v. United States*, 602 U.S. 821, 829–30 (2024) (citations omitted).  James Madison, who drafted the Bill of Rights, "described protections for the jury trial right as among 'the most valuable' that appear in 'the whole list.'"  *Id.* at 830 (citing 1 Annals of Cong. 755 (1789)).

The Sixth Amendment and due process under the Fourteenth Amendment guarantee a criminal defendant the right to a trial by an impartial jury.  U.S. Const. amend. VI; *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  "No right touches more the heart of fairness in a trial." *Stockton v. Virginia*, 852 F.2d 740, 743 (4th Cir. 1988).  The Sixth Amendment also affords a confrontation right that requires "a jury's verdict [ ] be based upon the evidence

19

developed at the trial," which "shall come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right[s]." *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965) (quotation omitted). This right "goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Id.* at 472 (quotation omitted). Together, these rights ensure that a verdict comes from the unanimous decision of "indifferent" jurors based solely upon only the evidence developed at trial. *Irvin*, 366 U.S. at 722.

"When a serious, non-speculative question of juror impartiality arises during trial, the [trial court judge] must determine whether the affected jurors remain fair and impartial." *United States v. Smith*, 919 F.3d 825, 834 (4th Cir. 2019); *see also United States v. Thompson*, 744 F.2d 1065, 1068 (4th Cir. 1984) ("When a question is raised . . . about whether a juror can fulfill his duties with an open mind, the [trial] court must determine that the juror is competent to proceed before continuing with the trial."). "A trial judge must be ever watchful to prevent prejudicial occurrences." *Gardner v. Ozmint*, 511 F.3d 420, 424 (4th Cir. 2007) (citation and quotation omitted).

External influence on a juror triggers additional safeguards. "It is clearly established under Supreme Court precedent that an external influence affecting a jury's deliberations violates a criminal defendant's right to an impartial jury." *Barnes v. Joyner*, 751 F.3d 229, 240 (4th Cir. 2014); *see also* J.A. 23, 25 (§ 2254 Petition citing this case). "'[U]nder clearly established Supreme Court case law,' an influence on a jury's deliberative process is external if it is either 'extraneous prejudicial information; i.e., information that was not admitted into evidence but nevertheless bears on a fact at issue in the case,' or if it is 'an

20

outside influence upon the partiality of the jury, such as private communication, contact, or tampering . . . with a juror.'" *Barnes*, 751 F.3d at 245 (quoting *Robinson v. Polk*, 438 F.3d 350, 363 (4th Cir. 2006)). The distinction between external and internal influences is important, as only external influences "necessitate a thorough judicial inquiry." *Wolfe v. Johnson*, 565 F.3d 140, 161 (4th Cir. 2009). In *Remmer v. United States*, the Supreme Court "clearly established . . . a defendant's entitlement to an evidentiary hearing" to address allegations of external jury influence, and "[p]ost-*Remmer* Supreme Court case law has confirmed that due process requires a hearing to alleviate concerns of juror partiality." *Barnes*, 751 F.3d at 242–43; *see also Smith v. Phillips*, 455 U.S. 209, 215 (1982) ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."). The Supreme Court has explained that "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer*." *Smith*, 455 U.S. at 217; *see also* Opening Br. at 20 n.2 (quoting the same). The hearing can occur at any time when the potential taint is discovered, during trial or post-verdict. *See Barnes*, 751 F.3d at 244 (citing *Ladd v. State of S.C.*, 415 F.2d 870, 873 (4th Cir. 1969)).

The Sixth Amendment also guarantees that "the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend VI. This "right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland*, 466 U.S. at 684. Furthermore, the Supreme Court has recognized that "the right

21

to counsel is the right to the effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970).

## V.

This case presents an extraordinary confluence of events, in which the rights central to our jury trial system—revered by the Framers and enshrined in the Bill of Rights—were denied to Sweeney.

## A.

First, the trial court judge neglected his duty to prevent prejudicial occurrences by failing to adequately question Juror No. 4 and failing to inquire at all into the potential impartiality of the other eleven jurors.

The trial court judge was given a note indicating that Juror No. 4 had visited the crime scene the night before deliberations began "to walk through the scene," where he saw "a couple of [government] witnesses." J.A. 190. This clearly presented a non-speculative question of Juror No. 4's impartiality. *See Smith*, 919 F.3d at 834. Beyond the obvious concerns, there is case law from this Court intimating that a juror's unauthorized visit to a crime scene can violate a defendant's constitutional rights to an impartial trial and confrontation. *Sherman v. Smith*, 89 F.3d 1134, 1136–38 (4th Cir. 1996).[6]

---

[6] In *Sherman*, we stated: "[Defendant] contends that [the] juror[ ]'s unsupervised visit to the crime scene violated his Sixth Amendment rights to confront and cross-examine witnesses against him and to be judged by an impartial jury. We shall assume for purposes of argument that [the] juror[ ]'s site visit amounted to a constitutional violation of [defendant's] rights." 89 F.3d at 1137.

22

Thus, based on the information in the jury note, the judge was obligated to "determine whether [Juror No. 4] remain[ed] fair and impartial." *Smith*, 919 F.3d at 834. We have made clear that "although ordinarily the question as to whether a juror is fair and impartial is a matter addressed to the discretion of the trial judge," still "the judge is bound either to make or to permit such inquiries to be made as will enable him in the exercise of his discretion to exclude from the jury persons who . . . are not fair and impartial jurors within the contemplation of the law. This is true in all cases." *Neal v. United States*, 22 F.2d 52, 53 (4th Cir. 1927). Therefore, while it is true that a trial judge has "ample leeway to formulate the questions to be asked" and "broad discretion in evaluating the significance of potential juror bias," *Smith*, 919 F.3d at 834–35, this leeway presupposes that the judge formulates *some* questions, as he is "bound" to do, *see Neal*, 22 F.2d at 53, and *does* evaluate the significance of the bias—neither of which occurred here.

All the judge said to Juror No. 4 was "Tell me what happened," and then "Is this in any way going to affect your –". J.A. 190–91. To begin, neither of these are formulated as questions: the first is an open-ended directive, and the second was cut off. Additionally, the judge did not probe into Juror No. 4's responses at all. To "Tell me what happened," Juror No. 4 gave a very brief reply, indicating that he "got out and went by the scene" to "see . . . an actual visual" because he "see[s] topographical views all the time" and considers them to "not give an accurate [view]." J.A. 190–91. Juror No. 4's short statement provoked numerous potential follow-up questions—e.g., how long were you at the scene, what time of day did you go there, what buildings did you walk by, which witnesses did you see, what is your familiarity with topographical views, what did you

23

learn from the actual visual, did it confirm or call into question what was presented at trial—none of which the judge pursued. Juror No. 4's reference to the topographical views, like the diagram presented at trial, indicate that he had doubts that he wanted to resolve through a visit to the crime scene—doubts to which Sweeney was entitled unless the government met its burden based solely on the evidence presented at trial. Despite the paucity of the information that the judge elicited from Juror No. 4, the judge only asked, "Is this in any way going to affect your –" before being cut off by Juror No. 4, who replied, "No." J.A. 191. The judge then told Juror No. 4 to return to his seat, content with Juror No. 4's responses.

In addition to the question of Juror No. 4's impartiality, the judge was also presented with a non-speculative question of the other jurors' impartiality: Through the jury note, the judge knew that Juror No. 4 had mentioned his visit to other jurors. But the judge failed to ask *any* questions of Juror No. 4 about his conversation with the other jurors. He did not ask what information Juror No. 4 told the other jurors, to whom he relayed that information, what the other jurors' reactions were, whether the other jurors had any questions, who told him he should inform the judge, et cetera. Additionally, although the jury had been deliberating for thirty-five minutes before the note was delivered and fifty-eight minutes before the jury was brought into the courtroom, the judge did not inquire as to how long any conversation about Juror No. 4's visit lasted.

Furthermore, the judge did not conduct any inquiry whatsoever of any of the other eleven jurors. When such a situation arises, judges typically "question[] each juror individually" to determine whether any are biased. *Smith*, 919 F.3d at 834. For example,

24

after the jury foreperson in a narcotics case informed the judge that a juror "conduct[ed] an independent investigation of certain evidence, which had already been admitted at trial, and reported her findings to the other members of the jury," the judge "questioned every member of the jury individually," and, more specifically, "extensively questioned [them] to determine if the extraneous material which came before the jury had tainted or prejudiced any of them." *United States v. Seeright*, 978 F.2d 842, 849–50 (4th Cir. 1992). In contrast here, the trial court judge did not ask questions of any of the other eleven jurors, such that he was not even in a position to determine whether they had been tainted or prejudiced by the information reported by Juror No. 4. To put it plainly, the judge did nothing to find out whether the other eleven "affected jurors remain fair and impartial." *Smith*, 919 F.3d at 834. Instead, without any questioning, the other eleven remained on the jury to deliberate and ultimately convict Sweeney.

The trial court judge abdicated his responsibility to be "ever watchful to prevent prejudicial occurrences." *Gardner*, 511 F.3d at 424. Not only did he not ask sufficient questions of Juror No. 4, but he did not ask any questions to determine whether any of the other eleven jurors were no longer impartial. These failures encroached on Sweeney's right to an impartial jury and confrontation right under the Sixth and Fourteenth Amendments.

## B.

Beyond this general responsibility to ensure an unprejudiced jury, because Juror No. 4's crime scene visit was an external influence, it triggered Sweeney's right to an evidentiary hearing. The trial court judge did not conduct such a hearing.

25

"[T]he Supreme Court has never provided a formula for deciding whether a particular influence upon the jury was external or internal," but it has indicated that "the distinction . . . is [] 'based on the nature of the [influence].'" *Robinson*, 438 F.3d at 362 (quoting *Tanner v. United States*, 483 U.S. 107, 117 (1987)).  However, there is clearly established Supreme Court case law indicating that both (1) extraneous prejudicial information and (2) outside influence upon the partiality of the jury are external influences. *Barnes*, 751 F.3d at 245.  As for the first, extraneous prejudicial information is "information that was not admitted into evidence but nevertheless bears on a fact at issue in the case." *Robinson*, 438 F.3d at 363.

Here, Juror No. 4's visit to the crime scene constitutes extraneous prejudicial information.  He went to the scene to get "an actual visual" that he considered "better" than the "topographical view[]" presented at trial, J.A. 190, and that visual bears on facts at issue in the case—particularly where vantage point, the amount of artificial light at night, and the distance of certain buildings were key issues at trial, and where the government had published a diagram of the crime scene to the jury.  J.A. 76–77, 183; *see also* J.A. 30 (§ 2254 Petition).  As Sweeney argued to the district court, "Juror Number 4's personal observation of the crime scene would have had to have affected his views on these issues." J.A. 31 (§ 2254 Petition).  This information is quite different from that which has been deemed an internal influence, such as a juror reading an "eye for an eye" Bible passage during deliberations, *Robinson*, 438 F.3d at 358–63, or a juror using drugs and alcohol during trial, *Tanner*, 483 U.S. at 117.  In those instances, the jurors' actions had no bearing on any facts relevant to the trial but were instead "internal to the deliberation process."

26

*Robinson*, 438 F.3d at 363.  In contrast, Juror No. 4's crime scene visit and the information he gleaned is properly considered extraneous information because "it was not revealed to the jury during trial, and it is not the kind of general information that jurors bring with them into deliberations." *Fullwood v. Lee*, 290 F.3d 663, 682 (4th Cir. 2002).

In such a case, where "the danger is not one of juror impairment or predisposition," *Stockton*, 852 F.2d at 744, but rather the effect of the extraneous prejudicial information, Sweeney is entitled to an evidentiary hearing like that in *Remmer*, *see United States v. Sandalis*, 14 F. App'x 287, 289 (4th Cir. 2001) ("when a party makes a threshold showing that improper external influences came to bear on the decision-making process of a juror, an evidentiary hearing on juror bias . . . is required") (citing *Remmer*, 347 U.S. at 229–30).  The potential impact of the extraneous prejudicial information on as many as all twelve jurors makes this even more necessary.  "This potentially widespread taint of the jury compelled the district court to conduct a *Remmer* hearing." *United States v. Johnson*, 954 F.3d 174, 181 (4th Cir. 2020).  But no such hearing was conducted.

Assuming arguendo that the colloquy of Juror No. 4 could constitute such a hearing, it fell far short of what was required.  A trial "court's management of th[e] incident" at such a hearing must be "both procedurally and substantively" sound.  *Id.* at 180.  Procedurally speaking, the judge has a responsibility to question all potentially affected jurors himself. *See id.* at 180–81.  The judge here fell short of this procedural requirement by first failing to ask Juror No. 4 about what information he had relayed to the other eleven jurors, and then failing to conduct any inquiry of the other eleven jurors.  But "[w]ithout questioning each juror individually, the district court could not know whether any

27

remaining jurors were prejudiced by [Juror No. 4's crime scene visit], even if those jurors had not witnessed [the scene themselves]." *Id.* at 181. Furthermore, a court "confronted with a credible allegation of an improper external contact" may not rely on third-party information to assuage any concerns about said contact. *Id.* at 180. But Nunzio's question, "if you were to go into deliberations, would you be able to deliberate based upon the facts here as opposed to what . . . you saw?" prompted Juror No. 4 to respond for himself and on behalf of the other jurors, saying that "they would have no problem with basing their decision[] off of the evidence which was presented in the case." J.A. 192. Not only did the judge fail to elicit any such information himself, but the information about the other eleven jurors' alleged impartiality was given by a third party, Juror No. 4.

Substantively, the court cannot just "engage[] in an abbreviated consideration of [Juror No. 4's] allegation." *Johnson*, 954 F.3d at 180–81. Rather, "the entire picture should be explored." *Remmer v. United States*, 350 U.S. 377, 379 (1956). In a case where a juror reported that members of the jury were being photographed by defendants' associates, this Court held that "the court's attention to the question whether the reported incident, in fact, had occurred was only the beginning of the inquiry," and the judge's failure to probe further was "substantively deficient." *Johnson*, 954 F.3d at 180–81. Here, the judge himself only said to Juror No. 4 "Tell me what happened," J.A. 190, which should have been just the beginning of the inquiry.

The trial court judge's failure to conduct a proper evidentiary hearing, to which Sweeney was entitled by law, deprived Sweeney of his constitutional rights under the Sixth and Fourteenth Amendments.

28

C.

In addition to the judge's failure to sufficiently inquire into the entire jury's potential prejudice, he also failed to take proper steps to mitigate or cure that taint and to more broadly prioritize Sweeney's right to a fair trial.

Even after learning that Juror No. 4 was tainted, the judge allowed him to return to the jury lounge with the other eleven jurors while the court and counsel considered next steps. *See* J.A. 86, 490–91. The judge acknowledged that he could separate the jurors in twelve different rooms. J.A. 197. This would have avoided the possibility that Juror No. 4 would share additional information, worsening any taint of the other eleven, and also ensure that the jury did not resume deliberations until the parties had resolved how to proceed. However, the judge chose not to do so. *Id.* As Sweeney argued to the district court, "the only explanation given for both tolerating and facilitating these contacts was that the trial was running long and there was not time to have the jurors 'waiting around' or 'in 12 different rooms.'" J.A. 33. Consequently, all jurors remained together for one hour and sixteen minutes.

Beforehand, the judge had only briefly instructed Juror No. 4 to "not [ ] discuss anything that happened during your tour of the crime scene. . . . Any experiences you had, that's not something I want you to share with anybody else." J.A. 196. The judge provided no further admonition or instruction. Significantly, this was an instruction given to a juror already known to disobey court orders, and whom the judge recognized may continue to disobey orders. Earlier, when Nunzio said, "[Juror No. 4] can't help but tell them what he saw," the judge acknowledged, "I know." J.A. 192.

29

Furthermore, the judge did not instruct any of the jurors to not deliberate during this recess. *See* J.A. 86 (postconviction court judge stating, "I understand they were not instructed."). To the contrary, the judge acknowledged that they likely *would* talk about the case, stating, "They can talk. I don't know what else to do." J.A. 196–97. Nunzio chimed in, "While they are there they might as well do something," and government counsel added, "Instead of waiting around." *Id.*; *see also* J.A. 18 (§ 2254 Petition explaining the same). Their assumption that the jurors would talk included Juror No. 4, as he was not instructed that he could not participate in any conversations. As mentioned above, Juror No. 4 was only instructed to not share what happened when he visited the scene, but not that he should withhold his opinions on the case, which had been impacted by that visit. Not only did the trial court judge fail to determine the extent of the jury taint, but he also failed to then separate the jury to prevent further contamination, nor did he properly instruct them. It disturbs trust in the judicial process that the judge allowed Juror No. 4 to return to the jury lounge with the rest of the jurors and that the jurors were presumed to continue their discussions, absent any instruction otherwise, for well over one hour.

During that recess, the court and parties discussed how to proceed. When a juror or jurors are deemed tainted, a judge has various options for proceeding. This includes replacing a biased juror with an alternate, or proceeding with a jury of less than twelve people. *Thompson*, 744 F.2d at 1068. It is also within a judge's discretion to declare a mistrial based on a tainted juror, *id.*, and a judge may declare a mistrial sua sponte if it is a "manifest necessity," *United States v. Perez*, 22 U.S. (9 Wheat.) 579, 580 (1824); *see also*

*United States v. Sloan*, 36 F.3d 386, 400 (4th Cir. 1994). While "a valid concern may be the expense and loss of time associated with a mistrial," "the court must give primary attention to the possibility of a biased juror." *Thompson*, 744 F.2d at 1068. A defendant's constitutional right to a fair and impartial trial must always take priority—and certainly before the convenience of the court, counsel, and jury.

The only options reflected in the record—and which were offered by government counsel and Nunzio—were bringing the entire jury to the crime scene or striking Juror No. 4. *See* J.A. 192–95. When Nunzio asked, "Does the Court have a preference?," the judge responded, "I don't have a strong preference[]." J.A. 192. However, the judge went on to express a preference against the crime scene visit, remarking, "I'm not sure that's even doable," and that "it requires a whole lot of effort." J.A. 193. Despite Nunzio reporting that Sweeney "would very, very much prefer everybody see what he saw" at the crime scene, and government counsel agreeing "I think that's the best option," the judge ultimately determined that option was off the table. J.A. 194–95; *see* J.A. 19 (§ 2254 Petition explaining the same). He stated that "the ability of the sheriff to take the other jurors out there today is non-existent. We might be able to do it Monday, but I don't think that's realistic. We've already told this jury that this is a four-day event and we're already in day five." J.A. 197. The judge rejected the option that was preferred by both parties in favor of finishing the case quickly—and that is exactly what happened, with the eleven-member jury returning a verdict on eight counts after deliberating for only one hour and fifteen minutes. *See* Opening Br. at 6; J.A. 204–214.

31

The trial court judge never even contemplated a mistrial.  He never contemplated replacing Juror No. 4 with an alternate, whom he had just excused earlier that day.  *See* J.A. 187–88.  He also never contemplated probing further into the potential taint to better determine whether a mistrial was a "manifest necessity."  In this way, he did not give his "primary attention to the possibility of [ ] biased juror[s]" in the remaining eleven, as is required, *Thompson*, 744 F.3d at 1068; rather, he seemed to prioritize expediency.  While the saying goes, "justice delayed is justice denied," it is also true that justice rushed may be no justice at all.

The trial court judge ultimately struck only Juror No. 4.  But as Sweeney previously argued to the Maryland Circuit Court, "[t]he same rationale that provided the basis for removing Juror Number 4 applied equally to an unknown number of jurors with whom Juror Number 4 spoke about his independent investigation." J.A. 435.

A curative instruction to the remaining jurors might have helped mitigate any taint, as juries are presumed to follow instructions. *See United States v. St. Louis*, 889 F.3d 145, 155 (4th Cir. 2018).  But the trial court judge skipped over this bulwark, too.  After excusing Juror No. 4, the judge never instructed the remaining eleven jurors to not consider what Juror No. 4 had told them. *See* J.A. 435 (arguing in Second Suppl. to Pet. for Post Conviction Relief that "[a]lthough the court admonished Juror Number 4 to not *further* discuss his conduct and whatever conclusions he drew as a result of his investigation, the court did not likewise instruct the other jurors to refrain from discussing or considering whatever Juror Number 4 told them.") (emphasis in original); *see also* J.A. 462 (Appl. for Leave to Appeal Denial of Pet. for Post Conviction Relief stating that "The remaining

32

jurors were not advised to not discuss the case or what they may have learned from Juror Number 4."). Accordingly, the eleven-person jury's guilty verdict could have been based on the information that Juror No. 4 had conveyed to them in the morning, which the judge never inquired about, or the information discussed during the recess, both of which the judge never instructed them not to consider.

The judge's failure to investigate prejudice in the jury, conduct the hearing that *Remmer* requires, consider a mistrial, and take steps to mitigate any potential further taint significantly contributed to a breakdown of the judicial process in this case, such that Sweeney was deprived of his constitutional rights.

### D.

Next, Sweeney's attorney rendered inadequate counsel by failing to sufficiently inquire into the prejudice that had potentially infected the jury and then, uninformed, choosing to proceed with an eleven-member jury.

For a criminal defendant to show that his right to the effective assistance of counsel has been violated, he must establish both that his counsel's performance was deficient, and that the deficient performance prejudiced his defense. *Strickland*, 466 U.S. at 687. As for deficient performance, counsel's conduct must "f[a]ll below an objective standard of reasonableness." *Id.* at 688. The Supreme Court has explained that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 690–91. Here, Nunzio did not reasonably investigate

33

Juror No. 4's taint nor the potential taint of the remaining eleven jurors; additionally, his decision that further investigation was unnecessary was not objectively reasonable.[7]

After the judge spoke ever so briefly with Juror No. 4, Nunzio asked permission to pose questions to Juror No 4 himself. J.A. 191. But the questions he then asked were not much more probative nor the responses revealing. Nunzio first asked, "Do any of the other jurors know that you went there?", to which Juror No. 4 responded, "They do. But they stopped me . . . because they thought that I should . . . present what I just said to you all." J.A. 191. At this point, Nunzio could not reasonably decide that probing further into this matter was unnecessary. He had only asked if *any* of the other jurors knew that Juror No. 4 went to the crime scene, and Juror No. 4's response did not elucidate how many of the other jurors knew—was it all of them, a few, or only one? Additionally, Juror No. 4's response indicating that "they" knew he went to the crime scene should have spurred extensive additional inquiry: What did they know about him going there, what information had he shared with them, and how did they react, for example. Instead, Nunzio's next question was, "[W]ould you be able to deliberate based upon the facts here as opposed to what . . . you saw?" J.A. 191. Juror No. 4 then responded, "That is correct. I would have no problem with basing my decision, and they would have no problem with basing their

---

[7] *See* J.A. 437 (arguing in Second Suppl. to Pet. for Post Conviction Relief that "It was incumbent upon competent counsel to ascertain the impact Juror Number 4's improper conduct had on the rest of the jury. Trial counsel made the decision to move forward with an 11 member jury, essentially in a vacuum, without the information necessary to determine if that was sound strategy.").

34

decision, off of the evidence which was presented in the case." J.A. 192. This answer is troubling for a few reasons.

First, Juror No. 4's response suggests that what he saw at the crime scene verified what he had heard at trial from the government. It is reasonable to infer that Juror No. 4 expressed that he could "bas[e] [his] decision . . . off of the evidence which was presented in the case" because his visit confirmed the evidence presented at trial—eyewitness testimony and the diagram—all of which was government evidence. J.A. 192. Second, Juror No. 4 was speaking not only for himself, but on behalf of the other jurors with respect to their ability to be impartial. As Chief Justice Marshall explained, "[t]hose who try the impartiality of a juror . . . ought to hear the statement made by [that juror]." *Neal*, 22 F.2d at 54 (quotation omitted). It is unreasonable to make a decision about the other eleven jurors' potential taint based on a comment made by Juror No. 4, rather than by those eleven jurors themselves. Finally, Juror No. 4's remark indicates that he knew, or at least had insight into, how the other jurors would proceed moving forward based on how they had reacted to the information he shared.

But again, despite the obvious concerns, Nunzio did not ask any follow-up questions and only said, "You know where I'm coming from?" J.A. 192. Juror No. 4 responded, "Yes, sir." J.A. 192. The inquiry then ended.

Shortly thereafter, when discussing potential options for moving forward, Nunzio acknowledged that "[Juror No. 4] can't help but tell them what he saw." J.A. 192. Despite this acknowledgment; based only on the scant, troubling responses from Juror No. 4; and after a less than two-minute conversation with his client, who was facing life sentences in

35

a murder trial in which he had not presented any evidence; Nunzio informed the court that he wished to bring all jurors to the crime scene and, if that was unfeasible, "I think" move forward with eleven jurors.  J.A. 195.

Nunzio—nor anyone else, judge or government counsel included—did not contemplate a potential mistrial on the record.  He did not present Sweeney with the option of replacing Juror No. 4 with an alternate juror.  He did not consider further inquiry into Juror No. 4's taint.  He did not request the judge hold an evidentiary hearing like that in *Remmer*, to which Sweeney was entitled.  He did not ask to conduct an inquiry of the other jurors as to what they had learned and whether they, too, were tainted.[8]  At each of these points, Nunzio failed to question the court's error and failed to perform his role in the judicial process as defense counsel; his error compounded that of the court.  Nunzio chose to instead proceed, in a vacuum, with a potentially-tainted eleven-person jury.  This choice was unreasonable.

As Justice Gorsuch has explained, "at the time of the [Sixth] Amendment's adoption and for most of our Nation's history, the right to a trial by jury for serious criminal offenses meant a trial before 12 members of the community—nothing less."  *Khorrami v. Arizona*, 143 S. Ct. 22, 23 (2022) (Gorsuch, J., dissenting from denial of cert.).  The Federal Rules of Criminal Procedure provide a right to a twelve-member jury, although a defendant can

---

[8] *See* J.A. 435 (arguing in Second Suppl. to Pet. for Post Conviction Relief that "In failing to request that the court *voir dire* the rest of the jury to ascertain precisely what Juror Number 4 told them and to what extent they may have been influenced by this information, before deciding to proceed with an 11 member jury, trial counsel rendered deficient assistance that caused prejudice to Petitioner.").

waive this right by giving knowing and intelligent consent in open court. *United States v. Fisher*, 912 F.2d 728, 731 (4th Cir. 1990); Fed. R. Crim. P. 23(b). But waiving that right should be undertaken with the utmost diligence and discernment. Studies have shown that the risk of conviction rises as the size of the jury diminishes. *See Ballew v. Georgia*, 435 U.S. 223, 234 (1978) (citing statistical studies). Therefore, one could say that proceeding with an eleven-person jury in any murder case—significantly, one where the defendant is facing multiple life sentences, and where the defense did not present any evidence—is questionable. Doubly so where there was no inquiry into whether those eleven jurors were tainted.[9] No objectively reasonable lawyer would allow his client to waive his right to a twelve-person jury in these circumstances without additional investigation.

Additionally, Sweeney's waiver was arguably not knowing, as is required: As he argued to the district court,"[w]hen [he] waived his right to a jury with twelve members, he had no idea how Juror Number 4's visit to the crime scene had affected that juror's perception of the case, what Juror Number 4 had told the other jurors about that visit, or how extensively Juror Number 4 had sought to influence other jurors both before and after the court had learned of Juror Number 4's unauthorized visit," J.A. 8, and, therefore, "[w]ithout that information, the choice to waive [his] right to a jury of twelve . . . could only be uninformed," J.A. 36–37.

---

[9] *See* J.A. 437 (arguing in Second Suppl. to Pet. for Post Conviction Relief that "Trial counsel's choosing to proceed with an 11 juror panel, in and of itself, posed a great risk to Petitioner by reducing the number of unanimous votes necessary to convict him. Electing to proceed in the absence of critical information that was readily available through *voir dire* of the panel elevated that risk from strategic to blind.").

37

Nunzio's testimony at the postconviction review hearing only confirms the deficiency of his performance. He testified that he "[c]ertainly" had concerns about what Juror No. 4 had seen at the crime scene. J.A. 76. He also admitted that he did not know what Juror No. 4 did at the scene, nor what the witnesses Juror No. 4 saw were doing. J.A. 78. Yet despite these concerns and lack of information, he did not question Juror No. 4 to glean additional responses on these issues. Nunzio also admitted that he "[a]bsolutely" thought about concerns with the decision to proceed with eleven jurors, reducing the number needed to reach a unanimous decision. J.A. 94. His explanation for proceeding with eleven, rather than moving for a mistrial, was that "[t]hings were very good," he "had made a lot of headway in the courtroom," and "[t]he jurors seemed to be receptive as you watched them day after day. They were very attentive." J.A. 90–93. He continued that "[t]here were things that came out of the trial that [he and Sweeney] both thought were very positive," including a theory elicited on cross-examination that implicated Walls by challenging the angle of Sweeney's position and the bullet wound. J.A. 90–92. But Nunzio had put on *no* evidence. And his alternative theory was weakened by the testimony of other government witnesses and the firearms examiner. It is unreasonable for a defense attorney in a murder case to believe that things "were very positive" where he presented no witnesses nor evidence, no matter how "receptive" or "attentive" the jurors seemed to be. J.A. 90–92.

Also at the postconviction review hearing, Nunzio emphatically recalled that he did not believe that the other eleven jurors were tainted, yet he testified inaccurately as to other details, and equivocated on other questions. He stated that "[m]emory serves me that the

38

jury was not tainted as to what [Juror No. 4] said or did. . . . [T]here was no present-sense impression at that time and even until today that the jury was contaminated." J.A. 112. But without having asked any questions of the other jurors nor any questions of Juror No. 4 regarding what he shared, how he could he be so sure that the jury was not contaminated? As Sweeney puts it, "Nunzio's claimed observations . . . were based on speculation." Opening Br. at 26. The certainty of Nunzio's response is undermined by other statements made at the hearing. Nunzio recalled incorrectly what Juror No. 4 had shared with the court about his crime scene visit, stating, "If memory serves me, he drove by. I don't know if he conclusively said that there were the witness [sic]. I remember, he said he didn't roll down windows or anything and [the trial court] had elicited this if memory serves me, but he just drove down the street, and that's all he did." J.A. 77. None of this is in the record, and, in fact, some is directly controverted by the record. *See* J.A. 190 (Juror No. 4 went to "walk through the scene," he "got out and went by the scene," and he saw "a couple of witnesses"). After being presented with the jury note, Nunzio corrected himself, stating, "He got there, got out, looked, no real action and went on." J.A. 77–78. He then added, "I remember [the trial judge] asked [Juror No. 4] extensively." J.A. 78. This was certainly not the case; instead, as discussed earlier, the judge posed one open-ended directive and one question that was cut off by Juror No. 4's interruption. How could Nunzio be so certain that the jury was not contaminated if he was wrong about what Juror No. 4 had even done at the crime scene and what Juror No. 4 had shared with the court and the parties?

His misremembering abounded elsewhere; Nunzio testified that the other jurors were not in the courtroom while the judge conversed with Juror No. 4, which was

inaccurate and promptly corrected by Sweeney's postconviction counsel. *See* J.A. 83–84. Later, when asked to confirm that Juror No. 4 "did tell at least some jurors that he went to the scene" and "did in fact have some conversation with the jury," Nunzio's initial response was belied by the transcript, at which point he stated that he would "defer to the record." J.A. 117–18. Nunzio's testimony at the postconviction review hearing cannot justify his actions at trial.

While we must give "a heavy measure of deference to counsel's judgments," our task remains that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances." *Strickland*, 466 at 691. Here, giving Nunzio due deference and in light of all the circumstances, it was unreasonable for him to fail to investigate into the jury taint and instead decide, in a vacuum, not to move for a mistrial but rather to proceed with eleven jurors.[10]

---

[10] It bears brief mention that Nunzio made other errors, including failing to object to Juror No. 4 being sent back into the jury lounge with others during the recess, and failing to request a curative instruction for the remaining eleven jurors when they resumed their deliberations. *See* J.A. 36, 435.

Sweeney had raised several other claims before the Maryland Circuit Court regarding Nunzio's ineffective assistance of counsel, which he has since abandoned. These were regarding Nunzio's failure to impeach a government witness, failure to object to government witnesses reading prior statements into evidence, failure to object or move to strike testimony regarding Sweeney's prior bad acts, failure to file a motion in limine to prevent admission of a weapon that was irrelevant and prejudicial, failure to object to the government's improper remarks during opening and closing arguments, misstatement of the government's burden of proof during his closing argument, J.A. 401–429 (Suppl. to Pet. for Post Conviction Relief), and failure to request voir dire of the jury regarding grand jury transcripts that were sent back to the jury during their deliberations, J.A. 437–441 (Second Suppl. to Pet. for Post Conviction Relief).

As for the second *Strickland* prong, "the concept of prejudice is defined in different ways depending on the context in which it appears." *Weaver v. Massachusetts*, 582 U.S. 286, 300 (2017). "In the ordinary *Strickland* case, prejudice means 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* (citing *Strickland*, 466 U.S. at 694). But in deciding *Strickland* itself, the Supreme Court stated that it was not "establish[ing] mechanical rules," and "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 696. That Court made clear that "[i]n every case the court should be concerned with whether . . . the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Id.* That is squarely what happened here: a breakdown of the adversarial process.

Nunzio rendered representation to Sweeney that was far below what is objectively reasonable and, as a result, Sweeney was convicted by an eleven-member jury that might have been wholly prejudiced by information from Juror No. 4's crime scene visit. This deprived Sweeney of his Sixth Amendment right to the effective assistance of counsel, further undermining his right to a fair trial.

\*    \*    \*

The breakdown of the judicial process—from Juror No. 4, to the trial court judge, to defense counsel Nunzio—deprived Sweeney of his constitutional right to a trial before a fair and impartial jury based solely on the evidence presented in the courtroom.

41

There can be no confidence that Sweeney was tried by indifferent jurors who were unprejudiced by extraneous information. Due to the judge's and Nunzio's failings, the record only reflects that the eleven jurors who ultimately convicted Sweeney were told *something* about Juror No. 4's visit to the crime scene. But not much more. There can also be no confidence that the eleven-person jury found Sweeney guilty based on the evidence developed at trial, as opposed to the unknown information conveyed by Juror No. 4. In this way, the burden of proof was compromised, with any reasonable doubt created by the eyewitness testimony potentially resolved by Juror No. 4's visit and his discussions with the other jurors. Furthermore, the unknown information conveyed by Juror No. 4 could have been incorrect and was never tested by examination at trial. For example, as Sweeney explained to the district court, because Juror No. 4's crime scene visit was during a different month than that during which the shooting happened, it could have "skewed Juror No. 4's perception of the lighting and vantage points issues that were being contested by the defense at trial." Opening Br. at 23; J.A. 31–32. Juror No. 4 may have relayed what he did not know to be flawed information about the evening light to the other jurors, but "the record is barren" due to the judge's and Nunzio's failure to ask adequate questions. J.A. 32. That failure also means that they gathered no information about how government "witnesses appeared to Juror Number 4 outside of the courtroom, what they may have been doing, or how Juror Number 4 characterized his observations of these witnesses to his fellow jurors," which he could have used to either call into question or bolster their credibility. *Id.* The court and the parties then—and we today—are without any such detail. Without this detail, and without much information at all about the scope and impact of

42

Juror No. 4's visit to the crime scene on the rest of the jury, Sweeney's conviction cannot stand as fair.

## VI.

We must next determine the warranted remedy. "The Supreme Court has [ ] recognized that certain structural errors are so severe as to render a trial inherently unfair and thus, should not be subject to harmless error analysis." *Sherman*, 89 F.3d at 1138. These errors involve "structural defects in the constitution of the trial mechanism" such that "[w]ithout these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Arizona v. Fulminante*, 499 U.S. 279, 309–10 (citation and quotation omitted). The Supreme Court has identified "at least three broad rationales" for deeming an error structural. *Weaver*, 582 U.S. at 295.

First, an error may be structural "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest." *Id.* This is present here: Sweeney's right to a trial by an impartial jury and his confrontation right, guaranteed by the Sixth and Fourteenth Amendments, are based on founding-era principles that a defendant must be tried by an indifferent jury of his peers based only on the evidence presented.

Second, "an error has been deemed structural if the effects of the error are simply too hard to measure," or the "effect of the violation cannot be ascertained." *Id.* (citation and quotation omitted). This, too, is present here. The trial court judge and Nunzio's

43

significant shortcomings made ascertaining the effects of their errors nearly impossible. Because they failed to probe into whether any of the remaining eleven members of the jury were tainted, one cannot discern the effect of any such potential taint:  e.g., whether any potential taint did in fact lead to Sweeney's conviction, whether or how the outcome might have differed had more than just Juror No. 4 been excused, whether or how the outcome might have differed following a mistrial.  Stated differently, the inability to prove that the eleven-member jury was in fact tainted and whether that taint led to Sweeney's conviction is part and parcel of the fact that both the judge and Nunzio failed to make an inquiry of those jurors in the first place.  *Cf.* J.A. 24 ("[T]he court's failure to *voir dire* the jurors in the required manner has denied Petitioner the opportunity to determine the extent of those injuries.").  And as this Court has explained, "[w]e simply cannot know what affect a twelfth juror might have had on jury deliberations.  Attempting to determine this would involve pure speculation." *United States v. Cubelo*, 343 F.3d 273, 281 (4th Cir. 2003).

Third, "an error has been deemed structural if the error always results in fundamental unfairness," which includes, for example, complete denial of counsel to an indigent defendant, or a judge's failure to give a reasonable doubt instruction.  *Weaver*, 582 U.S. at 296.  We need not discuss this third rationale.  In its analysis, the Supreme Court made "one point [ ] critical":  that this third category is not necessary for an error to be deemed structural.  *Id.*  It also explained that "[i]n a particular case, more than one of these rationales may be part of the explanation for why an error is deemed to be structural." *Id.*  That is precisely what is before us now:  both the first and second rationales capture the failings in this case, which are thus properly considered structural errors.

44

The case before us is quite different from *Sherman v. Smith*, where this Court applied harmless error review. 89 F.3d 1134. To begin, the errors before us now are the confluence of extraordinary failings from juror, to judge, to attorney, rather than the single error of a juror's unauthorized visit at issue in *Sherman*. But even comparing the two for their shared flaw, the case cannot be guiding. In *Sherman*, after being convicted, the defendant moved for a new trial based on allegations of a juror's unauthorized visit to the crime scene. *Id.* at 1136. The trial judge held an evidentiary hearing and ultimately denied the defendant's motion. *Id.* On appeal, the defendant argued that the juror's unauthorized visit constituted structural error because it defied harmless error analysis. *See id.* at 1138.

This Court found that "we cannot conclude that one juror's unauthorized site visit is a structural error that renders every trial inherently unfair." *Id.* at 1140; *see also id.* at 1138. However, the Supreme Court has since clearly stated that "[a]n error can count as structural even if the error does not lead to fundamental unfairness in every case." *Weaver*, 582 U.S. at 296; *see also McCoy v. Louisiana*, 584 U.S. 414, 427 (2018) (finding an error structural "[u]nder at least the first two rationales"). As explained above, there are two additional rationales that can deem an error structural—both of which are met in the present case.

We also found that the issue in *Sherman* was "amenable to the traditional tools of harmless error analysis." 89 F.3d at 1140. There, the trial judge held a post-trial hearing during which the court elicited details about the juror's visit: why he went to the crime scene, what he saw, what he did. We explained that when conducting such an inquiry about a juror's unauthorized visit, "a court can look to the nature and extent of the juror's activity and assess how that activity fit into the context of the evidence presented at trial," as well

45

as "consider whether the juror learned information that was merely cumulative of other evidence or whether he unearthed new information not previously presented to the jury." *Id.* at 1139–40. That is exactly what the trial court judge did in *Sherman*, such that the effect of the error could be assessed in the context of other evidence presented at trial. *See id.* at 1138. Far from the case here. Instead, neither the trial court judge nor Nunzio sufficiently probed into any of the aforementioned considerations of Juror No. 4 nor the other jurors, and as a result, the "effect of the violation cannot be ascertained" because of the nature of the error itself. *Weaver*, 582 U.S. at 295 (citation and quotation omitted). Our prior decision in *Sherman* is inapposite to the case at hand for multiple reasons and therefore does not limit our inquiry to harmless error. Instead, for the reasons explained above, the myriad issues in Sweeney's trial constitute structural error.

Because of the structural error at issue in this case that extends far beyond just Nunzio's ineffectiveness—instead, from juror, to judge, to attorney, this error infected the entire judicial process and Sweeney's right to a fair trial—and because "[t]he Sixth Amendment requires more than appellate speculation about a hypothetical jury's action," *Sullivan v. Louisiana*, 508 U.S. 275, 280 (1993), Sweeney is entitled to a new trial.

## VII.

For the foregoing reasons, we reverse the district court's denial of Sweeney's petition and remand with instructions to issue a conditional order of release unless a new trial is completed within a period determined at the district court's discretion.

*REVERSED AND REMANDED WITH INSTRUCTIONS*

QUATTLEBAUM, Circuit Judge, dissenting:

Jeremiah Antoine Sweeney's appeal involves one, and only one, claim. He argues the district court improperly denied his Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") claim that the Maryland postconviction relief ("PCR") court misapplied Supreme Court law in denying him ineffective assistance of counsel relief. On that claim, Sweeney contends his lawyer did not do enough to rule out the possibility that—contrary to what he told the court and what the other jurors said in their note—the juror who went to the crime scene contaminated one or more of the other jurors with information about his visit. Because of that, Sweeney claims the Maryland PCR court improperly denied his ineffective assistance of counsel claim. But he offered no evidence of any contamination. Nor did Sweeney offer any evidence, let alone an argument, that if more investigation had been done, he would not still have been convicted. So, on the only claim properly before us—whether the state court misapplied the law in addressing Sweeney's ineffective assistance of counsel claim—this appeal should be straightforward. The Maryland PCR court did not unreasonably apply clearly established law when it held that Sweeney's counsel was not deficient. And Sweeney did not show prejudice. Thus, Sweeney's ineffective assistance claim fails.

The majority's treatment of that claim is perplexing. It does not address it at all until page 33 of its 46-page unpublished opinion. And there, while concluding that Sweeney's lawyer, Justin Nunzio, acted unreasonably, the majority never cites—and certainly never applies—AEDPA. For example, it never holds that no fairminded jurist could rule the way the state PCR court did based on clearly established Supreme Court law. Likewise, it never

47

holds that had Sweeney's lawyer measured up to the majority's standards, there is a reasonable probability that the trial would have turned out differently. The majority just sidesteps the only claim Sweeney actually raised in state court, presented to the district court, and appealed.

Instead, ignoring AEDPA's exhaustion requirements and governing principles of party presentation, the majority raises on its own, and then decides the case on, a totally different ground from what Sweeney argued to the state courts, to the district court or to us on appeal. According to the majority, the combination of the juror's crime scene visit plus the failure of both the trial judge and Sweeney's lawyer to protect against contamination structurally violated Sweeney's Sixth Amendment right to an impartial jury. Under that reasoning, the majority concludes that it does not have to apply AEDPA. Nor does it have to find prejudice. Things were so unfair, the majority says, that Sweeney gets a new trial.

What is the majority's justification for deciding the appeal on issues neither Sweeney nor his lawyer raised in his state court trial, his state court appeal, his state court post-conviction relief proceedings, his federal habeas claim before the district court or his appeal to us and that none of those prior courts addressed either? To the majority, it's "the special circumstances of this case." Maj. Op at 17.

That alone is a problem. What's the standard for this? It seems purely subjective. Like beauty, special circumstances are in the eye of the beholder. Employing amorphous concepts like "the special circumstances of this case" permits judges to disregard binding precedent to reach preferred outcomes. And it gives no guidance to trial judges or litigants.

48

How are they supposed to know when to follow the law or when the circumstances are special enough to deviate?

But more than that, the majority's approach undermines our ordered system of justice. That system requires that we follow AEDPA's statutory requirements and Supreme Court precedent. We are not free to scour the record for issues that we think are important when the parties never raised them below and then dispense our subjective views of justice. That, however, is exactly what the majority does. The moment this decision is issued, it is untenable under binding Supreme Court precedent.[1] *See United States v. Banks*, 29 F.4th 168, 175 (4th Cir. 2022) ("Authority is untenable if its reasoning or holding is inconsistent with a Supreme Court decision.").

To explain my dissent, I first describe how current law requires that we affirm the district court's dismissal of Sweeney's AEDPA claim arguing that the Maryland PCR court misapplied Supreme Court law. After that, I point out my disagreements with the majority's conclusions about Sweeney's counsel before explaining why the majority's decision to

---

[1] We should not be any less alarmed by the majority's opinion just because it is unpublished. While that of course means it has no precedential value, *see Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 219 (4th Cir. 2006), lawyers and litigants sometimes cite to unpublished opinions. *See* Melissa H. Weresh, *The Unpublished, Non-Precedential Decision: An Uncomfortable Legality?*, 3 J. App. Prac. & Process 175, 175 (2001). As Aesop taught long ago in *The Wolf in Sheep's Clothing*, things can be more dangerous than they appear. Aesop, The Wolf in Sheep's Clothing, in *Aesop's Fables*, Library of Congress, https://perma.cc/JDE5-NSJ4. Just as wolves are dangerous even in sheep's clothing, deviating from requirements imposed by Congress, the Supreme Court and this Court is problematic, even in an unpublished opinion.

raise and pursue claims not raised below or here, or even to the Maryland courts, is improper.

## I.

### *A. The Trial*

A Maryland jury convicted Jeremiah Antoine Sweeney of second-degree murder, use of a handgun in the commission of a felony or crime of violence, attempted second-degree murder and attempted first-degree murder. The parties did not submit a complete transcript of the trial court proceedings, but the Court of Special Appeals of Maryland found these facts:

> On April 10, 2010, the events which led to Robert Anderson's death occurred in the 2100 block of East Marshall Place in Landover, Maryland. That afternoon, [Sweeney] got into an argument with Eric McDonald and accused him of having stolen some marijuana which belonged to [Sweeney]. McDonald denied having stolen anything from [Sweeney] and the two exchanged some profanities. Some time later, [Sweeney] walked to his house, and then returned to where McDonald was visiting with friends. [Sweeney] was holding a gun clip and announced: "I got my piece," referring to a firearm. Shortly thereafter, [they] yelled threats at each other for approximately thirty minutes, during which [Sweeney] proclaimed: "I'm going to kill somebody." The heated exchange happened in the area around house #2108 on the street, where David Walls lived. Upon seeing that [Sweeney] had a handgun, Walls asked him to leave. [Sweeney] then turned to walk up the street, inserting the clip into his gun as he did so. [Sweeney] and McDonald had continued to yell at each other, and when [Sweeney] reached the area in front of his house, he dared McDonald to "cross the gun line."
>
> Walls then implored the young men in front of his house, including Anderson, to come inside. At first the group did not comply, but when they did begin to make their way toward Walls's house, [Sweeney] fired his gun once into the air, and then fired approximately five or six times in the direction of McDonald and the other young men. Anderson was struck by a

bullet in the back of the head and fell to the ground; neighbors attempted to render aid. [Sweeney] then paced around the area in front of his house before getting into his red Cadillac and driving away.

J.A. 356–57. About an hour into the jury's deliberations, the court received a note: "Juror Number 4 went to the crime scene yesterday to walk through the scene and a couple of witnesses were there. Is this okay? There was no interaction." J.A. 190 (cleaned up). The court summoned Juror Number 4 and asked him what happened. He explained:

> I just got out and went by the scene, just basically the crime scene, Your Honor. I just wanted to get a visual because I know—I see topographical views all the time and I know that that does not give an accurate—well, there's a better way to get an accurate view, which is to see a visual, an actual visual. And that's all I did. I spoke to no one.
>
> As a matter of fact, I spoke to no one, and no one saw me. But I did see, you know, just a couple of witnesses that were, you know, that were there.

J.A. 190–91. The court asked if this would affect his verdict. He answered no. Sweeney's counsel, Justin Nunzio, asked if any of the other jurors knew that he visited the scene. Juror Number 4 replied yes, "[b]ut they stopped me, too, because they thought that I should stop talking and I present what I just said to you all." J.A. 191. Nunzio and the prosecutor inquired if the juror could limit his verdict to the evidence presented at trial without considering the crime scene. He replied, "I would have no problem with basing my decision, and they would have no problem basing their decision, off of the evidence which was presented in the case." J.A. 192.

Counsel then conferred with the court. Nunzio expressed concern that the juror "can't help but tell them what he saw." J.A. 192. The prosecutor suggested having the Sheriff's Department arrange for the entire jury to visit the neighborhood. The court

51

expressed concern about the feasibility of this option but allowed Nunzio to discuss it with Sweeney. Nunzio explained that Sweeney's preference was for the jury to visit the scene, and the prosecutor agreed that was "the best option." J.A. 194. The court asked what Sweeney wanted to do if the visit could not be arranged. Nunzio answered that he "would probably just strike Juror Number 4." J.A. 195. The prosecutor stated that he would not object to that if a visit was not feasible.

The court summoned Juror Number 4 back to the bench and instructed him "not to discuss anything that happened during your tour of the crime scene" while it considered the matter further. J.A. 196. The court then dismissed the jury "to the jury lounge."[2] J.A. 196.

After the jury left the courtroom, the court continued to confer with counsel about Juror Number 4 and the other jurors:

> THE COURT: They can talk. I don't know what else to do.
>
> MR. NUNZIO: He can't be part of the process.
>
> THE COURT: I told him not to be sharing any of these experiences.
>
> MR. NUNZIO: Absolutely right. While they are there they might as well do something.
>
> [THE PROSECUTOR]: Instead of waiting around.
>
> THE COURT: Unless I put them in 12 different rooms. Well, I have one more thing to do and I will talk to the sheriff.

J.A. 196–97.

---

[2] This is apparently distinct from the jury room.

52

After about a one-hour recess, the court returned to the bench and announced that a visit to the scene was not feasible. The court then had the following colloquy with Sweeney:

> THE COURT: . . . It's my understanding, from your lawyer, that you're agreeable to us excusing Juror Number 4 and going forward with the remaining 11 jurors and to let them make their decision.
>
> Is that true?
>
> [SWEENEY]: Yes.
>
> THE COURT: Do you have any questions?
>
> [SWEENEY]: No, sir.
>
> THE COURT: Have you thoroughly discussed this with your lawyer? Is that what you want to do?
>
> [SWEENEY]: Yes.
>
> THE COURT: Because you have a right to have 12 jurors decide your innocence or guilt, and if you give it up then that's exactly what we're going to do and we'll let 11 people decide your fate.
>
> All right?
>
> [SWEENEY][3]: Yes, sir.

J.A. 197, 201.

The court then excused Juror Number 4. The jury deliberated for two more hours before returning its guilty verdict.

Nunzio moved for a new trial, arguing, among other things, that the juror misconduct resulted in a miscarriage of justice because Sweeney was "left in a position to

---

[3] The transcript attributes this statement to Juror Number 4, but the parties agree that this is a transcription error.

choose between a mistrial, having all the jurors visit the crime scene (after the close of the evidence) and going forward with 11 jurors." J.A. 294. After the trial court denied that motion, Sweeney appealed. But he did not raise the juror misconduct issue. The Maryland Court of Special Appeals affirmed Sweeney's convictions.

### B. State Habeas Proceedings

Sweeney petitioned pro se for postconviction relief in Maryland state court, arguing that Nunzio was ineffective for (1) failing to object to Juror Number 4's being allowed back into the deliberation room after he told the court he had visited the crime scene, (2) "creat[ing] a conflict of interest when Counsel decided to strike Juror #4 without petitioner's consent," and (3) "fail[ing] to explain petitioners [sic] his rights regarding his rights [sic] to 12 jurors or a declaration of a mistrial." J.A. 382. Sweeney subsequently obtained PCR counsel, who argued that Nunzio was ineffective "by choosing to proceed with an eleven member jury without first *voir diring* the remaining jurors regarding Juror Number 4's independent investigation of the crime scene or failing to request a mistrial." J.A. 432. PCR counsel emphasized that Nunzio's failure to insist on an examination of the remaining jurors meant that he did not know precisely what the other jurors knew about the crime scene visit. And counsel pointed out that Juror Number 4 was around the other jurors for nearly an hour while the court researched whether it could take the other jurors to the crime scene.

In advancing these arguments, PCR counsel relied on a Maryland state court decision called *Nash v. State*, 94 A.3d 23 (Md. 2014). PCR counsel recognized that *Nash* required a motion for a mistrial before voir dire was required. But he argued Nunzio should

54

have requested to voir dire the remaining jurors under *Nash* anyway. According to PCR counsel, failing to do so meant Nunzio "made the decision to move forward with an 11 member jury, essentially in a vacuum, without the information necessary to determine if that was sound strategy." J.A. 437.

The state PCR court held an evidentiary hearing at which Nunzio was the only witness who testified. Nunzio explained that he was "[a]bsolutely" concerned about Juror Number 4's visit to the crime scene both because the juror violated a clear instruction and because one of the issues at trial was the layout of the scene. J.A. 75–76. Nunzio recalled that the court "extensively" examined what Juror Number 4 did at the scene. J.A. 78.

Nunzio testified that the three options available were to have the jury visit the scene, strike Juror Number 4 and proceed with eleven jurors, or move for a mistrial. Nunzio discussed these options with Sweeney. Although Nunzio had worried about the other eleven jurors talking with Juror Number 4 during the recess, he thought they were in a common room but not deliberating. The state PCR court then discussed the parties' interpretation of the trial transcript. The parties informed the state PCR court that all twelve jurors were in the courtroom while the trial judge questioned Juror Number 4 "with the husher on." J.A. 85. The state PCR court confirmed that the trial judge did not instruct the jury not to deliberate but that they were sent to the lounge, which differed from the room in which the jury deliberated.

Nunzio then explained how he made the decision to strike Juror Number 4. He testified that he informed Sweeney that he would have been "more than happy to" move for a mistrial but he "defer[red] to" Sweeney. J.A. 90. He and Sweeney reached "almost a

collective" agreement that Juror Number 4 could no longer serve on the jury, but they did not want to risk the progress they had made with this jury. J.A. 90–91. Nunzio believed that the trial had gone "very good," that "[t]he jurors seemed to be very receptive" to the defense theory and that favorable testimony had been introduced about the position of various people at the scene. J.A. 90–91. Nunzio was particularly concerned that a second trial might yield less favorable testimony from some witnesses. He reiterated that he was not concerned about proceeding with eleven jurors because "we were making headway inside the courtroom," highlighting his impeachment of some of the State's witnesses. J.A. 94.

On cross-examination, Nunzio agreed when the State's attorney asked, "there was nothing that [Juror Number 4] said that would lead you to believe that his observations had in any way tainted the other jury members, was there?" J.A. 111. Nunzio believed that the trial judge had sufficiently questioned Juror Number 4 regarding his discussions with the other jurors. He reiterated that he had "no present-sense impression at that time and even until today that the jury was contaminated." J.A. 112.

The state PCR court denied Sweeney's petition for post-conviction relief. In rejecting Sweeney's claim, the court explained:

> *Nash v. State* . . . establishes two circumstances where the trial judge has a duty to conduct *voir dire sua sponte*, when a party moves for a mistrial based on juror misconduct: (1) when a juror's actions constitute gross misconduct sufficient to raise a presumption of prejudice that must be rebutted before a mistrial motion is denied; and (2) when a material and relevant fact must be resolved before a trial judge may determine whether the presumption of prejudice attached. First of all, the Defense did not move for a mistrial, but instead decided to move forward with eleven jurors. Secondly, before deciding to proceed, Trial Counsel discussed options with the client on how

56

to proceed. Petitioner has failed to produce evidence that Trial Counsel included the option to *voir dire sua sponte* the remaining eleven jurors, failing to meet his burden. Defense essentially waived the issue to *voir dire sua sponte* the remaining eleven jurors when he conferred with his client on how to proceed and did so with the eleven jurors. Therefore, the Court feels that the Defense failed to meet its burden that but for the jury consisting of eleven jurors, the Petitioner would not have been convicted.

J.A. 452–53.

Sweeney then applied for leave to appeal the denial of his state petition. He asserted that the state "court's ruling fail[ed] to reckon with the claim as raised in the petition and argued at the hearing." J.A. 464. Sweeney argued that Nunzio should have "move[d] for a mistrial or request[ed] that the court *voir dire* the rest of the jury to ascertain precisely what Juror Number 4 told them and to what extent they may have been influenced by this information, before deciding whether to proceed with an 11 member jury." J.A. 465. The failure to conduct this inquiry meant that Nunzio advised Sweeney "in a vacuum, without the information necessary to determine if that was sound strategy." J.A. 466. The state court denied Sweeney's application for leave to appeal in a one-sentence order.

## C. Federal Habeas Proceedings

Next, Sweeney petitioned for federal habeas relief under 28 U.S.C. § 2254(d). In that petition, Sweeney emphasized that Nunzio "failed to determine the extent to which Juror Number 4 had been tainted by his visit to the crime scene and then had tainted the other eleven jurors during the time Juror Number 4 had spent deliberating with those jurors, and when [he] did not object to the court's failure to make that determination." J.A. 9. According to Sweeney, Nunzio's error caused Sweeney "to have his case determined by a jury that had been tainted by information that had been provided by Juror Number 4 . . .

57

and also to waive his right to a twelve person jury in a manner that was not knowing as required by clearly established law." J.A. 9. Abandoning his claim that Nunzio should have sought to voir dire the remaining jurors under *Nash*, Sweeney offered a new justification for his position. This time, Sweeney relied on our *Barnes v. Joyner*, 751 F.3d 229 (4th Cir. 2014) decision, where we applied *Remmer v. United States*, 350 U.S. 377 (1956). And Sweeney also claimed that under *Barnes*, he did not have to show a reasonable probability of a different result to establish prejudice. Instead, he argued he only had to show that counsel's deficient performance had a substantial and injurious effect on his right to a trial by an unbiased jury.

The district court denied Sweeney's petition. It cited our unpublished decision in *Daniel v. West Virginia*, No. 97-6806, 1999 WL 713865 (4th Cir. Sept. 14, 1999) to conclude that Sweeney was not entitled to a presumption of prejudice. The court found that counsel was not ineffective because he "offered [Sweeney] the option for the ultimate remedy . . . a mistrial, but Sweeney voluntarily waived that remedy when he elected to proceed with an eleven-member jury." J.A. 495. It also noted that moving for a mistrial is normally a strategic decision entrusted to counsel.

While the court recognized that "Sweeney argue[d] that his decision to waive the 12-person jury was not knowing, voluntary or intelligent," the court found this contention procedurally defaulted if raised as a separate claim. J.A. 495 n.6 (cleaned up). To the extent this argument was meant only to show prejudice, the court noted that "Sweeney made the decision to waive the 12-person jury." J.A. 495 n.6. The court also found that "any decision made by counsel is entitled to deference, as counsel testified that it was his impression

58

from Juror Number Four's testimony that the remaining jury members were not tainted."

J.A. 495 n.6. And while Sweeney alleged that "he was prejudiced because the jurors may

have discussed the crime scene visit during the recess where Juror Number 4 remained

with other members of the jury," the court found that no evidence supported this assertion.

J.A. 495 n.7. Finally, the court held that Sweeney could not establish prejudice because he

"failed to prove that he would not have been convicted if the decision had been made by a

twelve-person jury." J.A. 496.

This appeal followed. [4]

## II.

### A.  Ineffective Assistance of Counsel

Before addressing the majority's errors, I will analyze Sweeney's claim under our

law as I see it. In considering Sweeney's appeal, it is important to remember what he asks

us to do. His only claim is ineffective assistance of counsel. To that end, Sweeney contends

the state court unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984) to his

case. His overriding argument is that his trial counsel rendered deficient performance when

he did not request a *Remmer* hearing to voir dire the remaining eleven jurors about any

information Juror Number 4 might have passed on about his crime scene visit. He contends

---

[4] The district court denied Sweeney's habeas petition in a final order disposing of all claims. Sweeney timely noticed this appeal, filing an informal brief in support of his request for certificate of appealability in the absence of one from the district court. We granted the certificate on June 26, 2023. So, we have jurisdiction under 28 U.S.C. §§ 1292 and 2253.

that when a jury's integrity is questioned—like it allegedly was when Juror Number 4 told the other jurors that he visited the crime scene—*Remmer* requires a hearing "to determine from the facts whether or not communication with the juror by the outsider and the events that followed were prejudicial and therefore, harmful to the petitioner." *Remmer*, 350 U.S. at 378.

Sweeney claims the state PCR court improperly applied *Strickland* by not citing *Remmer*. Analyzing Maryland's *Nash* decision rather than *Remmer*, Sweeney insists, was improper because "[t]he state case (Nash) that the Maryland court cited did not substitute for *Remmer*." Opening Br. 18. He claims the state PCR court's misapplication of *Strickland* persisted when it held that the trial court was not required to voir dire all remaining jurors because Sweeney failed to move for a mistrial and when it found that Sweeney waived his right to seek a mistrial when he elected to strike Juror Number 4 and proceed with an eleven-person jury. Even though he was given the option for a new trial, Sweeney complains that trial counsel's failure to move under *Remmer* to voir dire the remaining jurors deprived him of the proper information to make the "right" choice. Last, Sweeney argues the state PCR court erred in concluding that he had not shown a reasonable probability of a different result. Instead, he insists he need only show that his trial counsel's performance caused substantial and injurious effect on his right to a trial by an unbiased jury.

*1. Standard of Review*

In advancing this claim, Sweeney faces a formidable standard of review. In fact, three standards shape our review of this case. They relate to (1) the district court; (2) the state court; and (3) ineffective assistance of counsel claims.

First, in reviewing a district court's application of the standards of 28 U.S.C. § 2254(d), "we review the district court's legal conclusions de novo and findings of fact for clear error." *Wolfe v. Clarke*, 691 F.3d 410, 423 (4th Cir. 2012) (quotation marks and citation omitted).

Second, our authority to collaterally review a state court adjudication is strictly circumscribed by AEDPA. *See Barnes v. Joyner*, 751 F.3d 229, 238 (4th Cir. 2014). Under AEDPA, we may grant habeas relief on a claim that has been previously "adjudicated on the merits"[5] in state court only if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).[6] As the Supreme Court has explained:

---

[5] We lack power to review habeas claims that are not reviewed by state courts. "[A] federal habeas court may not review unexhausted claims that would be treated as procedurally barred by state courts—absent cause and prejudice or a fundamental miscarriage of justice." *Longworth v. Ozmint*, 377 F.3d 437, 447–48 (4th Cir. 2004); *see also Horner v. Nines*, 995 F.3d 185, 208 (4th Cir. 2021) (denying habeas relief for unexhausted, procedurally defaulted claims).

[6] § 2254(d)(2) also permits claims that "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Neither Sweeney nor the majority argues this prong is relevant to this case.

61

> [A] state-court decision can involve an "unreasonable application" of [the Supreme] Court's clearly established precedent in two ways. First, a state-court decision involves an unreasonable application . . . if the state court identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case. Second . . . if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams v. Taylor*, 529 U.S. 362, 407 (2000) (O'Connor, J., delivering the majority opinion with respect to Part II).

But the bar is high. The state court's application of that law must be "'objectively unreasonable,' not simply incorrect." *Owens v. Stirling*, 967 F.3d 396, 411 (4th Cir. 2020) (quoting *Barnes*, 751 F.3d at 238–39). Indeed, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

AEDPA creates such an exacting standard because our review involves the sovereignty of the states. "Where a state court has previously ruled on the alleged wrongful conviction, as has happened in this case, concerns of comity and federalism 'reach their apex.'" *Crockett v. Clarke*, 35 F.4th 231, 241 (4th Cir. 2022) (quoting *Valentino v. Clarke*, 972 F.3d 560, 575 (4th Cir. 2020)). Thus, the Supreme Court has emphasized that habeas relief is not an opportunity for federal courts to look over the shoulder of state courts. "Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 562 U.S. at 102–03 (quotation marks and citation

omitted). The Supreme Court has stated, "[i]t bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102. It is hard to overstate the difficulty of the burden that must be met. As the Supreme Court explained: "If this standard is difficult to meet, that is because it was meant to be." *Id.*

Third, Sweeney brings an ineffective assistance of counsel claim under *Strickland*. There, the Supreme Court reaffirmed that the Sixth Amendment right to counsel "is the right to the effective assistance of counsel." *Strickland*, 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 & n.14 (1970) (cleaned up)). *Strickland* set forth a two-prong test governing ineffective assistance of counsel claims. A petitioner must show that (1) his counsel's performance was deficient and (2) counsel's deficient performance prejudiced his defense. *Id.* at 687.

To prove the first prong, the petitioner must demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [him] by the Sixth Amendment." *Id.* "Judicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "The critical question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Winston v. Pearson*, 683 F.3d 489, 504 (4th Cir. 2012) (quotation marks and citation omitted). And "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Even "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91.

63

To prove the second prong, the petitioner must show "that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Id.* at 687. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding," as "[v]irtually every act or omission of counsel would meet that test." *Id.* at 693. And "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* "Instead, *Strickland* asks whether it is 'reasonably likely' the result would have been different." *Harrington*, 562 U.S. at 111–12 (quoting *Strickland*, 466 U.S. at 696). "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' but the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Id.* (quoting *Strickland*, 466 U.S. at 693, 697). Ultimately, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 112.

But Sweeney's appeal involves not just a claim that trial counsel's assistance was ineffective. It involves a claim that the state PCR court misapplied *Strickland.* "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Id*. at 105. "AEDPA and *Strickland* thus provide 'dual and overlapping' lenses of deference, which we apply 'simultaneously rather than sequentially.'" *Owens*, 967 F.3d at 411 (quoting *Richardson v. Branker*, 668 F.3d 128, 139 (4th Cir. 2012)). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. The combination

64

of AEDPA and an ineffective assistance claim creates one of the most daunting standards in our law.[7]

With these standards in mind, we turn to Sweeney's arguments on appeal.

2. *The state court did not unreasonably apply* Strickland*'s deficient representation prong.*

Sweeney says the state PCR court unreasonably applied *Strickland* by not considering whether his trial counsel's failure to request that the remaining jurors be questioned offended *Remmer*. There are three reasons why his argument fails.

a.

First, Sweeney is right that the state PCR court did not cite *Remmer*. But that is because Sweeney did not cite *Remmer* to it. Sweeney's state PCR claim instead relied on Maryland's state law *Nash* decision. That case discusses a trial judge's responsibility to voir dire the jury sua sponte when a party has moved for a mistrial. It says nothing about the separate issue of when counsel may move to voir dire the jury.

A habeas petitioner must give the state an "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry,* 513 U.S. 364, 365

---

[7]Analogies outside the law are not always helpful, but one from tennis might shed some light on the steep hill Sweeney must climb. Recently, tennis legend Rafael Nadal, considered one of the greatest tennis players of all time, retired. Nadal holds twenty-two major titles, including a remarkable fourteen French Open championships. During his career, Nadal won one hundred twelve of the one hundred sixteen matches he played on the famed red clay of Roland Garros. That record caused one commentator to claim that "[t]he hardest thing in sports is beating Rafa Nadal in 3 out of 5 sets on clay." Annacone, Paul, Sportskeeda (May 16, 2022), https://perma.cc/6JTM-N96X. Sweeney's task might be said to be the legal equivalent of beating Nadal at the French Open.

(1995) (quotation marks and citation omitted). He provides this opportunity by "'fairly present[ing]' his claim in each appropriate state court . . . thereby alerting that court to the federal nature of the claim." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (quoting *Duncan,* 513 U.S. at 365–66 (1995)). Sweeney did not do this. As a result, the state PCR court could not have misapplied *Strickland* by not addressing a theory Sweeney never advanced—and indeed, it did not.

Besides, the state court correctly applied *Nash*; it said that because Sweeney did not request a mistrial, the trial judge had no duty to sua sponte voir dire the jurors. In fact, Sweeney has not argued to us that the state PCR court misapplied the theory that he advanced to that court. He argues that the state PCR court misapplied *Strickland* by not considering a claim that he did not make until his habeas petition in federal court. But we are reviewing a state court action under AEDPA. We cannot say the state court unreasonably applied an argument it never had a chance to address.

b.

Second, even if Sweeney had advanced a *Remmer* argument to the state PCR court, Sweeney has not shown it would be an unreasonable application of *Strickland* to reject it. That's because it is not clear that *Remmer* even applies to this case. Recall that habeas relief as Sweeney has argued it requires an adjudication that "involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). That means the state court decision must violate "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

66

In *Remmer*, a juror told the judge that a third party tried to bribe him. 350 U.S. at 380. The judge never informed defense counsel, and the trial went on. *Id*. at 378. When the defense learned of the contact after the trial ended, it moved for a new trial. *Id*. Ultimately, the Supreme Court determined that a hearing was necessary given that "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial." *Id.* at 379.

The Supreme Court has not clearly established that a juror's visit to a crime scene constitutes a "communication, contact, or tampering" sufficient to trigger *Remmer*. Indeed, at oral argument Sweeney's counsel conceded as much:

> JUDGE QUATTLEBAUM: "Has the Supreme Court clearly established that a *Remmer* hearing applies in a situation like this . . . ?"
>
> MR. CONFUSIONE: "I don't think they have."

Oral Argument: 6:20–6:42.[8]

Consistent with that concession, Sweeney cites no Supreme Court case holding *Remmer* applies to Sweeney's facts. Granted, several circuits have extended *Remmer* to claims alleging juror exposure to extraneous information. *See Mayhue v. St. Francis Hosp. of Wichita, Inc.,* 969 F.2d 919, 922 (10th Cir. 1992); *United States v. Perkins,* 748 F.2d 1519, 1533–34 (11th Cir. 1984); *United States v. Hillard,* 701 F.2d 1052, 1064 (2d Cir. 1983); *United States v. Bassler,* 651 F.2d 600, 603 (8th Cir. 1981)). But the Supreme Court

---

[8] Oral Argument: 6:20–6:42. https://www.ca4.uscourts.gov/OAarchive/mp3/22-6513-20240926.mp3

has rejected "the mistaken belief that circuit precedent may be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

Further, other circuit cases affirmatively *undermine* Sweeney's argument. Not every circuit extends *Remmer* to a juror's exposure to extraneous information. As the Eighth Circuit has recognized, "other circuits have confined the application of *Remmer* to cases alleging third-party contact with jurors." *Tunstall v. Hopkins,* 306 F.3d 601, 611 (8th Cir. 2002) (citing *United States v. Lloyd,* 269 F.3d 228, 238 (3d Cir. 2001)); *United States v. Williams–Davis,* 90 F.3d 490, 501–02 (D.C. Cir. 1996); *United States v. Boylan,* 898 F.2d 230, 260–61 (1st Cir. 1990)). "When the federal circuits disagree on the application of *Remmer* regarding any presumption of prejudice, it is difficult to say the [state] court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court." *Id.*

What's more, all *Remmer* requires is a hearing "to determine from the facts whether or not communication with the juror by the outsider and the events that followed were prejudicial and, therefore, harmful to the petitioner." 350 U.S. at 378. It does not require voir dire of all jurors. Here, once the jury alerted the trial judge that Juror Number 4 visited the crime scene and mentioned his visit to the other jurors, the trial judge inquired into the juror misconduct. He asked Juror Number 4 what he did. He learned from Juror Number 4 that the other jurors stopped him from discussing what he saw at the scene. And he instructed Juror Number 4 to refrain from discussing his visit with the other jurors while the judge and the parties discussed various options available to address the juror's

68

misconduct. The trial judge then gave Sweeney the opportunity to seek relief. The trial judge and both parties' counsel discussed various options, from all the jurors visiting the crime scene to a mistrial to striking Juror Number 4. After consulting with trial counsel, Sweeney elected to strike Juror Number 4 and proceed to trial with eleven jurors. True, no one discussed questioning the remaining jurors. But nothing in *Remmer* requires that specific procedure. So, it is not at all clear that Sweeney did not, in fact, receive a *Remmer* hearing.

In sum, the state PCR court could not unreasonably apply *Strickland* by determining Sweeney's trial counsel's failure to request a *Remmer* hearing was not deficient when the Supreme Court has not clearly established that *Remmer* applies to this situation. This is especially true when it is not clear that the proceedings that took place fall short of *Remmer*'s requirements.

c.

Third, Sweeney's deficiency argument boils down to an attack upon Nunzio's strategic decision made in the heat of trial. The state PCR court made this very point. It explained that "[t]his Court finds that many of the allegations made by [Sweeney] are attributed to the Defenses' choice in strategy that ultimately did not work in the Defendant's favor. Unsuccessful strategy does not result in an overturning of a conviction." J.A. 452. The state PCR court did not unreasonably apply *Strickland* in concluding that Nunzio's decision to strike Juror Number 4 and proceed with the trial was the type of strategic decision for which post-conviction relief was inappropriate.

Nunzio believed that the trial had gone "very good," that "[t]he jurors seemed to be very receptive" to the defense theory and that favorable testimony had been introduced about the position of various people at the scene, including Sweeney. J.A. 90–91. Nunzio was concerned that a second trial might yield less favorable testimony from some witnesses. He reiterated that he was not concerned about proceeding with eleven jurors because, highlighting his impeachment of some of the State's witnesses, "we were making headway inside the courtroom." J.A. 94. He explained that "[t]he jurors seemed to be very receptive as you watched them day after day after day." J.A. 91. Nunzio continued, "[t]hey were very attentive. There were things that came out of the trial that we both thought were very positive," including ballistics evidence regarding the gunman's position as compared to Sweeney's alleged position. J.A. 91.

Because several eyewitnesses testified for the prosecution, Nunzio faced an uphill battle in defending his client against the government's charges. Recognizing that, he responded to the comment that "[y]ou didn't have but so much to work with," by stating, "[c]orrect . . . at the end of the day, you have multiple people who are testifying as to the same thing." J.A. 108. Nunzio believed his options were limited. With glimmers of hope in a difficult situation, he weighed the dangers of proceeding with the eleven-member jury after Juror Number 4's visit. Juror Number 4 reported that the other jurors told him to stop talking about his visit to the scene as soon as he brought it up. And Nunzio testified that at no time did he believe that the jury had been tainted by any substantive information acquired by Juror Number 4.

70

Maybe Nunzio was right; maybe he was wrong. Maybe other lawyers, including those in the majority, would have made a different decision; maybe they would not. It does not matter. It is neither our job, nor our prerogative, to nitpick these impressions from the vantage of hindsight and what-ifs. "A lawyer must make many decisions before and during the course of a trial. And what often makes those decisions so difficult is that many cut both ways. The decision to advance an argument, introduce certain evidence, call a witness, cross-examine a witness aggressively or lightly and so many other decisions can be—and often are—double-edged swords. There are pros and cons each way." *Stokes v. Stirling*, 10 F.4th 236, 257 (4th Cir. 2021) (Quattlebaum, J., dissenting) (vacated and remanded). Even if Nunzio's decision not to demand a *Remmer* hearing was "made after less than complete investigation," it was still presumed "reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Because there is no clearly established right to a *Remmer* hearing in this situation, reasonable professional judgments must support the decision not to seek one.

And we should not forget Sweeney's role in the strategic choice he now decries. Nunzio informed Sweeney that he would have been "more than happy to" move for a mistrial, but he "defer[red] to" Sweeney. J.A. 90. Sweeney, like Nunzio, disfavored a mistrial. They reached "almost a collective" agreement to proceed with eleven jurors. J.A. 90. Under our system of representation, which relies on cooperation between client and counsel, lawyers must factor their clients' wishes into their approach to the case. Accordingly, clients cannot advocate for a course of action and then turn around and criticize their lawyer for pursuing it. Remember, the "reasonableness of counsel's actions

71

may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Strickland*, 466 U.S. at 691. For these reasons, Sweeney has not shown that the state PCR court misapplied *Strickland*'s deficiency requirement.

### 3. The state court did not unreasonably apply Strickland*'s prejudice prong.*

Sweeney also argues that the state PCR court unreasonably applied *Strickland* in finding that trial counsel's performance did not prejudice Sweeney. Remember, to show prejudice, Sweeney must show a substantial likelihood of a different result if Nunzio had requested a *Remmer* hearing. *Harrington*, 562 U.S. at 112. Before examining Sweeney's argument, recall the state PCR court's prejudice holding: "[T]he Court feels that the Defense failed to meet its burden that but for the jury consisting of eleven jurors, the Petitioner would not have been convicted." J.A. 453. Reviewing the state PCR court's order in totality reveals that the state PCR court displayed a proper understanding of the prejudice standard:

> [S]ome of Trial Counsel's actions could prejudice the defendant in some fashion. However, the standard the Defendant must meet to overturn a conviction is not only that trial counsel was inefficient, but also that but for that inefficiency, the Petitioner would not have been convicted. In this instance, there was ample evidence implicating the Petitioner in the murder of Robert Anderson. The cumulative allegations do not show that Petitioner's Constitutional right was violated.

J.A. 452. As explained below, nothing in the record suggests the state PCR court's application of that standard "*resulted in* a decision that was contrary to, or involved an

72

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) (emphasis added).

Sweeney faced a mountain of evidence. Indeed, the Maryland Court of Special Appeals described the prosecution's evidence:

> In the instant case the jury was presented with testimony which portrayed [Sweeney] as the shooter. He accused McDonald of stealing his marijuana, approached a gathering of McDonald and several others with a gun clip in his hand, argued loudly with McDonald and threatened that he would "kill somebody," walked back up the street toward his home while inserting the clip into a handgun, continued to shout at McDonald and dared him to "cross the gun line," and a short time later, while in front of his home, shot once into the air and then fired several shots towards McDonald and the others who were in the same area where Anderson was struck in the head and killed.

J.A. 374. Sweeney challenges the relevance of this evidence. But the Supreme Court has held the exact opposite. "In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

While there is plenty of evidence for the jury to convict Sweeney, the record contains no evidence that the jury was tainted—none. Juror Number 4 reported that the other jurors immediately told him to stop talking about his visit to the scene. He was subsequently struck from the jury. True, it is possible he was lying. And in theory, Juror Number 4 had an opportunity to continue talking about his visit while the court conferred with counsel. But Sweeney proffered no evidence of either of these possibilities. That dearth of evidence is fatal. We are not permitted to speculate on possibilities not in the record. To the contrary, "[i]n a federal habeas corpus proceeding, we presume that the state

73

court findings are correct." *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995) (citing 28 U.S.C. § 2254(d)). And in reviewing a district court's application of 28 U.S.C. § 2254(d), "we review the district court's legal conclusions de novo and findings of fact for clear error." *Wolfe,* 691 F.3d at 423 (quotation marks and citation omitted). Neither the state court nor the district court found any facts suggesting Juror Number 4 gave the rest of the jury any details about his visit. That's because there were none. There is no evidence in the record suggesting that Juror Number 4 did anything other than what he said. In fact, the record shows that when the other jurors learned of Juror Number 4's trip to the crime scene, they stopped him from discussing it—"they stopped me, too, because they thought that I should stop talking and [] present what I just said to you all." J.A. 191.

Not only is there no evidence any of the remaining jurors were tainted; there is no evidence that had Nunzio voir dired the remaining jurors, Sweeney would have avoided conviction. Even if the other jurors were questioned and even if one or more had been tainted with information from Juror Number 4, the remedy would have been a mistrial. In other words, the charges against Sweeney would not have gone away; he'd just have been tried again. And at that trial he'd face that same mountain of evidence he faced in the trial where he was convicted. There is no reason for predicting a different result had Sweeney chosen a mistrial.

Rather than explaining how the state PCR court's decision conflicted with clearly established Supreme Court holdings, Sweeney attempts to shift the test's focus from these decisions. Instead of following established law, the majority asks a different question— regardless of any prejudice, did the events surrounding Juror Number 4 deprive Sweeney

74

of a fair trial? In this effort, he relies on *Lockhart v. Fretwell*, 506 U.S. 364, 368–70 (1993). In that case, a district court granted a petitioner's capital murder conviction after the Arkansas Supreme Court affirmed the sentence. *Id*. at 367. After the Eighth Circuit affirmed the district court, the Supreme Court reversed. *Id*. at 368. But *Lockhart* does not replace the results test with a fairness test. To the contrary, *Lockhart* makes the petitioner's burden heavier. There, the Supreme Court said, "an analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall . . . ." *Id. at* 369–70 (cleaned up). Thus, if anything, Lockhart *adds* an element of unfairness; it does not offer it as an alternative. Indeed, "[c]ases such as *Nix v. Whiteside* and *Lockhart v. Fretwell* do not justify a departure from a straightforward application of *Strickland* when the ineffectiveness of counsel *does* deprive the defendant of a substantive or procedural right to which the law entitles him." *Williams*, 529 U.S. at 393 (cleaned up). That is precisely what Sweeney argues he was deprived of here.

Sweeney also cites the Supreme Court's opinion in *Weaver v. Massachusetts*, 582 U.S. 286 (2017) for the notion that he need only show general unfairness. And it is true that *Weaver* hints that in the context of structural error—which Sweeney never argued— the prejudice analysis might sometimes center on fairness rather than outcomes. *See id*. at 300. But the Court explicitly declared those hints dicta, disclaiming, "[i]n light of the Court's ultimate holding, however, the Court need not decide that question here." *Id.* Because the state court decision must violate the "holdings, as opposed to the dicta, of [the

75

Supreme] Court's decisions as of the time of the relevant state-court decision," it does not affect our analysis. *See Williams*, 529 U.S. at 412. *Weaver* thus offers no legitimate avenue for saying the state court applied *Strickland* inconsistently with any clearly established Supreme Court holdings.

In AEDPA cases, the petitioner must show that the state court whose decision we are reviewing violated clearly established Supreme Court law. Sweeney doesn't do this. He doesn't even try. As a result, his claim must fail.

### 4. Conclusion

To sum up, Sweeney did not argue *Remmer* to the state PCR court; he admits he cannot show *Remmer* even applies; he does not deny that his lawyer's decision to strike Juror Number 4 and proceed to trial with eleven jurors was a strategic decision; and he does not even attempt to argue that a *Remmer* hearing had a reasonable probability of producing a different outcome. Under Supreme Court precedent, any one of these is independently sufficient to doom Sweeney's case. Together, they are insurmountable. I would affirm the district court's decision that the state PCR court did not unreasonably apply *Strickland.*

### B. *The Majority's Errors*

The majority, of course, comes to a different conclusion. Primarily, it raises a litany of issues not addressed before any of the Maryland courts or before the district court. To the majority, these new issues show that Sweeney's Sixth Amendment right to an impartial jury was violated. Within that analysis, almost as an afterthought, the majority addresses Sweeney's claim that the Maryland PCR court misapplied his ineffective assistance of

76

counsel claim. I will first explain my disagreements with the majority's treatment of Sweeney's ineffective assistance of counsel claim—the only issue properly before us—before turning to the majority's spontaneous Sixth Amendment impartial jury analysis.

### 1.  *Ineffective Assistance of Counsel*

In fairness, I'm not sure the majority attempts to conduct an ineffective assistance of counsel analysis. It doesn't even analyze Sweeney's counsel's conduct until page 33 of its opinion. And the majority's discussion there seems more like another item on the laundry list of things the majority feels should have been done better or differently at Sweeney's trial than an independent analysis. But to the extent it reviews Sweeney's ineffective assistance of counsel claim, the majority goes astray by ignoring our required standard of review, by misapplying *Strickland*'s deficient performance prong and by failing to assess whether curing the deficiencies it finds would have been reasonably likely to result in a different outcome under *Strickland*'s prejudice prong.

a.

First, the majority simply ignores the statutorily mandated standard of review for this claim. Recall that under AEDPA—which necessarily guides our review—we may grant habeas relief on a claim that has been previously "adjudicated on the merits" in state court only if that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). And "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could

77

disagree on the correctness of the state court's decision." *Harrington*, 562 U.S. 86, 101 (2011) (quotation marks and citation omitted).

The majority ignores this. It doesn't say anything about whether fairminded jurists could disagree with the Maryland PCR court's decision; indeed, it hardly discusses that state court decision at all.

In the section of its opinion that discusses ineffective assistance of counsel, the majority cites the two *Strickland* prongs. And of course, *Strickland* is the Supreme Court's foundational ineffective assistance of counsel decision. But we are not on direct review of a *Strickland* decision. We are on a collateral review of the Maryland PCR court's application of *Strickland*. Indeed, in its 46-page opinion, the majority never says the state PCR court unreasonably applied clearly established federal law. How then can it grant relief?

In *Harrington*, the Supreme Court rebuked a circuit court decision that, like the majority, ignored AEDPA's standard of review. Here is what the Court said:

> Here it is not apparent how the Court of Appeals' analysis would have been any different without AEDPA. The court explicitly conducted a *de novo* review, and after finding a *Strickland* violation, it declared, without further explanation, that the state court's decision to the contrary constituted an unreasonable application of *Strickland*. AEDPA demands more. Under § 2254(d), a habeas court must determine what arguments or theories supported or, as here, could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court. The opinion of the Court of Appeals all but ignored the only question that matters under § 2254(d)(1).
>
> The Court of Appeals appears to have treated the unreasonableness question as a test of its confidence in the result it would reach under *de novo* review: Because the Court of Appeals had little doubt that Richter's *Strickland* claim had merit, the Court of Appeals concluded the state court

78

must have been unreasonable in rejecting it. This analysis overlooks arguments that would otherwise justify the state court's result and ignores further limitations of § 2254(d), including its requirement that the state court's decision be evaluated according to the precedents of this Court. It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.

*Harrington*, 562 U.S. at 101–02 (quotation marks and citations omitted). What the Ninth Circuit explicitly did in *Harrington*, the majority does implicitly—it conducts a de novo review. AEDPA does not permit this.

In addition, the majority ignores the overlapping standard that applies for ineffective assistance of counsel claims. Remember that for such claims, a petitioner like Sweeney must "[e]stablish[] that a state court's application of *Strickland* was unreasonable under § 2254(d) . . . ." *Id*. at 105. This makes his burden "all the more difficult." *Id*.

We are not permitted to brush these standards aside. Standards of review may not be exciting. But that does not mean they are not important. They are required guardrails for appellate review. They protect against judicial excess by prohibiting appellate judges from substituting their judgment for that of other courts that, under the law, have priority. The majority is not permitted to cast aside the standard of review that governs Sweeney's claims.

79

b.

Second, the majority fails to properly apply *Strickland*'s prong one—deficient performance. For brevity's sake,[9] I will describe just four examples of the majority's failures.

One, the majority says "Nunzio did not reasonably investigate Juror No. 4's taint nor the potential taint of the remaining eleven jurors." Maj. Op at 33–34. But as the majority notes, Nunzio did ask Juror Number 4 whether the other jurors knew he visited the crime scene. And after answering yes, Juror Number 4 said they stopped him from saying anything else.

The majority says Nunzio should have asked more questions and should have requested that the other jurors be questioned, too. That alone should give us pause. A panel of appellate judges is micromanaging a trial lawyer on how he should question a juror. How many questions would have satisfied the majority? And is there a danger that excessive questioning will prejudice the jury? The majority offers no guidance—just its view on Monday morning that the quarterback should have thrown a better pass.

But the majority's reasoning is even more concerning considering the context of the questions and answers it criticizes. Juror Number 4's answer was consistent with the note the other jurors sent the judge. Remember that the note said "[t]here was no interaction." J.A. 190. With that corroborating information, Nunzio's satisfaction with addressing the

---

[9] Using "brevity" to describe even a part of 50-page dissent is admittedly ironic. I appreciate that doing so may have caused readers to roll their eyes.

80

potential taint makes more sense. Could he have done more? Sure. But with Juror Number 4's answers matching the jury's note, Nunzio felt he had enough information make a strategic decision. *Strickland* does not permit us to second guess it.

The majority's explanation for why it feels more questions should have been asked reveals the extent of its nit-picking. The majority says that Juror Number 4's positive response to Nunzio's question—"Do any of the other jurors know you went there?"—means Nunzio failed to determine how many knew he went to the scene. But why does that matter if there was no interaction about what Juror Number 4 did or saw? Sure, Nunzio could have asked twenty more questions to rule out the possibility that one or more jurors learned something else. But his efforts were hardly constitutionally deficient, especially when Sweeney has absolutely no evidence that there was any contamination.

Not only does the majority nit-pick; to support its conclusion that Nunzio should have asked more questions, the majority misconstrues the record. When asked, Juror Number 4 said he could decide the case based on the evidence presented at trial. Perplexingly, the majority says "Juror No. 4's response suggests that what he saw at the crime scene *verified* what he had heard at trial from the government. It is reasonable to infer that Juror No. 4 expressed that he could 'bas[e] [his] decision . . . off of the evidence which was presented in the case' *because his visit confirmed* the evidence presented at trial—eyewitness testimony and the diagram—all of which was government evidence." Maj. Op. at 35 (emphasis added). Why is that reasonable to infer? The juror never said that and nothing he did say supports that inference. Rather than faithfully reviewing the record, the majority speculates. *See Koon v. North Carolina*, 50 F.4th 398, 409 (4th Cir. 2022) ("A

permissible inference must be reasonably probable given the facts, not just conceivable or possible. So we must reject tenuous inferences that rest upon speculation and conjecture.").

Similarly, when asked if he could decide the case based on the evidence from trial, Juror Number 4 stated the other jurors "would have no problem with basing their decision, off of the evidence which was presented in the case." J.A. 192. To the majority, "Juror No. 4's remark indicates that he knew, or at least had insight into, how the other jurors would proceed moving forward based on how they had reacted to the information he shared." Maj. Op. at 35. What does the majority mean by this? Juror Number 4 said the other jurors could base their decision on the evidence alone. If we make any reasonable inference at all about this, it is that Juror Number 4 believed the other jurors would limit their deliberations to the evidence as the court instructed them because they stopped him from saying anything more. It is hard to see what the majority seeks to wring from this.

Two, the majority criticizes Nunzio for not "contemplat[ing] a potential mistrial on the record." Maj. Op. at 36. This is remarkable. The record, considered as a whole, *does* show that Nunzio considered a mistrial. As the district court explained, "[t]he record reflects that Sweeney's counsel offered him the option for the ultimate remedy under *Remmer*, a mistrial, but Sweeney voluntarily waived that remedy when he elected to proceed with an eleven-member jury." J.A. 495. The record we are supposed to review— not the trial record in isolation—shows Nunzio did contemplate a mistrial, but he ultimately deferred to his client's wishes.

And Nunzio had good reasons to defer to Sweeney's wishes. Remember, the government had a mountain of incriminating evidence. Nunzio felt he had landed some

blows in cross-examining the government's witnesses, blows he feared he could not replicate as effectively at a second trial where he would not have the element of surprise.

Despite all that, rather than discussing the mistrial issue with Sweeney privately, the majority apparently would have had Nunzio "contemplate a potential mistrial on the record." Maj. Op at 36. Not doing so, the majority concludes, "was unreasonable." Maj. Op. at 36. Even there, though, the majority gets the standard of review wrong. The question is not whether we think Nunzio acted reasonably. The question is whether any fairminded jurist could find it reasonable to not openly "contemplate a mistrial on the record." Maj. Op. at 36. But under any standard, the majority's reasoning is hard to understand. After all, what does contemplating a mistrial on the record mean? I can't see why all fairminded jurists would find what Nunzio did on this issue constitutionally deficient.

Three, the majority says, "one could say that proceeding with an eleven-person jury in any murder case—significantly, one where the defendant is facing multiple life sentences, and where the defense did not present any evidence—is questionable." Maj. Op. at 37. Why is that? Here, even if Nunzio's information was not as conclusive as the majority would like, he had information that the remaining eleven jurors were untainted by information about Juror Number 4's crime scene visit. Those remaining jurors also had heard Nunzio's cross-examination of the government's witnesses, where Nunzio felt he had scored some points. So, the question is not whether you'd rather have eleven or twelve jurors in isolation. The question is whether you'd rather have eleven jurors who heard the cross-examination you perceived to have been effective and who you don't think are tainted hear the mountain of evidence against your client—or whether you'd rather have twelve

83

jurors who you are absolutely sure aren't tainted but might not hear as effective of a cross-examination consider that same mountain of evidence.

Whether we agree or disagree with what Nunzio did doesn't matter. Supreme Court and Fourth Circuit precedent is clear. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[,]" and even "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91; *see Cox v. Weber*, 102 F.4th 663, 676–677 (4th Cir. 2024), *cert. denied,* No. 24-6014, 2025 WL 247479 (U.S. Jan. 21, 2025). We should not second guess Nunzio's strategic choice.

Also, the "reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." *Id.* at 691. According to the majority, Nunzio should have disregarded Sweeney's wishes. First, that is not what Supreme Court law requires. Second, will such a rule make defendants better off? Would the majority have defense counsel ignore clients' wishes even when they accord with counsel's own strategic judgment?

Four, now on a roll, the majority declares, "[i]t is unreasonable for a defense attorney in a murder case to believe that things 'were very positive' where he presented no witnesses nor evidence, no matter how 'receptive' or 'attentive' the jurors seemed to be." Maj. Op. at 38. Once again, why is this right? Criminal defendants often do not have helpful

84

affirmative evidence. After all, favorable witnesses do not grow on trees. Neither does favorable evidence. The best—maybe the only—option for lawyers defending clients charged with crimes in some cases is to poke holes in the government's case. Sometimes that goes well. Sometimes it doesn't. But I don't understand the majority's categorical statement that when a lawyer is in that position, as Nunzio seems to have been, he can't make strategic decisions based on a belief that he had made progress in carrying out that strategy. Remember that Sweeney faced an uphill battle from the start. Multiple eyewitnesses to the shooting testified at trial. Nunzio achieved what he could on cross-examination and observed a positive reaction from the jury. Indeed, the reaction was positive enough that Sweeney himself did not want a new trial.

I fear the consequences of this micro-managing of defense counsel. I can't help but believe that many defense attorneys will read this decision, scratch their heads and wonder what they are supposed to do. Whatever strategic choices they make will be attacked by disaffected former clients and judges who think their Monday-morning quarterbacking would have won the game. They will fear, reasonably, that a judge may muse that he would have approached the case differently and declare their assistance ineffective, with all the travails that can attend—professional discipline, fines, reputational damage and malpractice suits. The resulting risk aversion will do nothing to help defendants like Sweeney.

For these reasons, the majority fails to properly apply *Strickland*'s prong one requirement of deficient performance.

85

c.

As to *Strickland*'s prejudice prong, the majority spends barely two paragraphs. Remember that to show prejudice, "*Strickland* asks whether it is 'reasonably likely' the result would have been different." *Harrington*, 562 U.S. at 111–12 (citing *Strickland*, 466 U.S. at 696). Despite that, the majority does not even attempt to analyze this prong. Instead, it cites *Weaver* for the proposition that "the concept of prejudice is defined in different ways depending on the context in which it appears." 582 U.S. at 300. The majority refers to *Strickland*'s acknowledgment that it did not "establish mechanical rules" and that "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Strickland*, 466 U.S. at 696. With those two statements, the majority finds prejudice by stating the shortcomings it perceives in Nunzio's performance "deprived Sweeney of his Sixth Amendment right to the effective assistance of counsel, further undermining his right to a fair trial." Maj. Op at 41. In other words, the majority believes there is no requirement that had Nunzio done what it believes he should, there is a reasonable probability of a different outcome. That is not the law and, even in an unpublished opinion, we should not pretend that it is.

True, *Weaver* discussed the possibility of replacing *Strickland*'s rules with a standard of fairness. But it expressly said it was not replacing *Strickland*'s results requirement. Instead, the Court said, "[i]n light of the Court's ultimate holding, however, the Court need not decide that question here." *Weaver*, 582 U.S. at 300. And since *Weaver*, the Court has not created any exception to the rule that a petitioner must show a reasonable probability of a different result. Thus, *Strickland's* second prong remains the law. So,

Sweeney and the majority's failure to analyze this prong is fatal. This should be game, set, match.

### 2.  The Majority's Sua Sponte Analysis

Undeterred by the insurmountable problems with Sweeney's ineffective assistance of counsel claim, the majority formulates a different way to order a new trial for Sweeney. It concludes that Juror Number 4's unauthorized visit to the crime scene, the trial judge's handling of the revelation of Juror Number 4's visit and Nunzio's purported failures combined to deprive Sweeney of his Sixth Amendment right to an impartial jury. And it declares this a structural error for which no showing of prejudice is required.

It is hard to overstate this judicial overreach. Try as one might, any hint of this argument is missing from the state and district court proceedings and from the briefs before us. Sweeney did not make this argument before the Maryland trial court or in his direct appeal to the Maryland appellate courts. Likewise, he did not make it before the Maryland PCR court. He didn't even make it when he sought relief under AEDPA in the district court. And he did not make it to us on appeal. This novel argument is the majority's and the majority's alone. Regrettably, in charting its own path, the majority violates AEDPA's exhaustion requirements and offends party presentation principles.

First, AEDPA. It states that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). As the district court said, "Sweeney failed to bring a claim, either on direct appeal or in his application for postconviction review, that the trial

87

court deprived him of the right to an impartial jury when it did not conduct a proper *Remmer* hearing. Sweeney's counsel conceded this fact during the postconviction hearing." J.A. 493. So, any unexhausted arguments—including the majority's impartial jury argument—are not properly before us.

In a habeas case just two years ago, we concluded that the state forfeited an argument by not raising it on appeal. *Stokes v. Stirling*, 64 F.4th 131, 136 (4th Cir. 2023), *cert. denied,* 144 S. Ct. 377 (2023). We said that "[i]t is well-established that a party's failure to raise or discuss an issue in its appellate brief is to be deemed an abandonment of that issue." *Id.* at 137 (quotation marks and citations omitted). We also said that "[e]nforcing waiver and forfeiture rules against appellees reflects the principle that we apply [these] rules on a consistent basis so that they provide a substantial measure of fairness and certainty to the litigants who appear before us." *Id.* at 137 (quotation marks and citations omitted). So much for consistent application.

Even outside of AEDPA, the majority flouts Supreme Court precedent on party presentation. "In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). These are not empty words. In *United States v. Sineneng-Smith*, the Supreme Court rebuked the Ninth Circuit for "depart[ing] so drastically from the principle of party presentation as to constitute an abuse of discretion." 590 U.S. 371, 375 (2020). There, our sister circuit spun an overbreadth argument out of a First Amendment, as-applied argument. *Id*. at 374. The

88

Court condemned this judicial overreach. "[A] court is not hidebound by the precise arguments of counsel, but the Ninth Circuit's radical transformation of this case goes well beyond the pale." *Id*. at 380.[10] We should follow Justice Ginsburg's guidance.

We have our own precedent on party presentation. The majority flouts it too. "We ordinarily do not consider arguments raised for the first time on appeal." *1988 Tr. for Allen Children v. Banner Life Ins. Co.*, 28 F.4th 513, 528 (4th Cir. 2022). Courts cannot "conjure up questions never squarely presented to them." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). "[I]t is not the role of the district court to act as a roving advocate, providing legal arguments to the parties before it." *Aikens v. Ingram*, 652 F.3d 496, 506 (4th Cir. 2011) (Diaz, J., concurring). "[A brief's argument section] must contain . . . [the] appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(8)(A). To the majority, none of this seems to matter.

How, then, does the majority justify serving as "roving advocate" for Sweeney? It cites *Frisbie v. Collins*, 342 U.S. 519 (1952) for two propositions: (1) "exhaustion 'is not

---

[10] *See also Castro v. United States*, 540 U.S. 375, 386 (2003) *(*Scalia, J., concurring) ("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief."); *Wood v. Milyard*, 566 U.S. 463, 473 (2012) ("For good reason, appellate courts ordinarily abstain from entertaining issues that have not been raised and preserved in the court of first instance . . . That restraint is all the more appropriate when the appellate court itself spots an issue the parties did not air below . . . ."); *United States v. Burke*, 504 U.S. 229, 246 (1992) (Scalia, J., concurring) ("The rule that points not argued will not be considered is more than just a prudential rule of convenience; its observance, at least in the vast majority of cases, distinguishes our adversary system of justice from the inquisitorial one.").

rigid and inflexible; [ ] courts may deviate from it and grant relief in special circumstances,'" Maj. Op. at 16 (citing *Frisbie*, 342 U.S. at 521); and (2) "[i]f there exist 'special circumstances [that] require[] prompt federal intervention' in a particular case, the court should be able to act," Maj. Op. at 16–17 (citing *Frisbie*, 342 U.S. at 522).[11]

Armed with *Frisbie*, the majority then concludes that "[t]he special circumstances of this case, which will likely never arise again, require our consideration of an issue not cleanly articulated and exhausted by Sweeney." Maj. Op. at 17. Those circumstances are Juror Number 4's unauthorized visit to the crime scene, the trial judge's handling of the revelation of Juror Number 4's visit and Nunzio's alleged failures.

The problems with the majority's approach are numerous. First, although it is a habeas case, *Frisbie* antedates AEDPA by 44 years. "AEDPA . . . changed the standards for granting federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). Why does the majority look back 73 years and ignore post-AEDPA Supreme Court guidance? If it had not done so, the majority would have found no post-AEDPA permission to disregard AEDPA. We cannot ignore Congress' express statutory provisions or decisions from the Supreme Court requiring their application.

Third, even if the majority's exhaustion conclusions were sound—and they aren't— they still would not justify the majority's litigating from the bench. The only relief those arguments would provide Sweeney is the ability for him to bring unexhausted arguments

---

[11] The majority's discussion of exhaustion and party presentation conflates the two concepts, collapsing them as if they were one. They are not.

90

to us. But Sweeney never argued to us that he was deprived of an impartial jury. The majority attempts to brush this under the rug by acknowledging it was not "cleanly articulated." Maj. Op. at 17. But Sweeney didn't articulate it at all. It was the majority, and the majority alone, who developed whole-cloth an argument Sweeney never sniffed at. Forget *Remmer;* forget *Strickland*; forget everything Sweeney's lawyers and the courts who have touched this case so far have done. The majority knows better; this case is really about the Sixth Amendment right to a fair trial.

Fourth, the majority's special circumstances principle is unworkably squishy. Why are these circumstances so special? Are there any criteria for that? Or is it just up to the subjective views of appellate judges? The total absence of standards for this special circumstances principle is concerning. I fear this approach could be used to avoid the settled requirements of the law and permit reaching preferred outcomes. I also fear the uncertainty it will breed for district courts and litigants.[12]

This is no way to run a railroad. Appellate review is not a game of moving target. We review the claims Sweeney actually made, not the ones we prefer he had made.

---

[12] Even if this were a valid principle, why does the majority say these circumstances will never arise again? The majority seems to supply its answer in a footnote: "It would be a damning indictment of this nation's legal system if trials are being so mishandled in more than the extremely rare case." Maj. Op. at 17, n.5. But this is circular. How do we know this was an extraordinary breakdown? Because it would be bizarre for this to happen again. The majority doesn't explain *why* it would be unusual for this to happen again. A juror does something he isn't supposed to do, the judge finds out, discusses with counsel how to proceed and the parties move on. How can we say this will never happen again?

Sweeney's only argument regarded ineffective assistance of counsel. Our review should be limited to that.[13]

### 3. Structural Errors

Finally, in its section on remedy, the majority introduces a whole new reason that Sweeney deserves a new trial—the errors in Sweeney's trial were *structural*. Like almost

---

[13] In addition to raising and deciding an issue no one ever argued or considered before, the majority nit-picks and misconstrues the record as to the Maryland trial judge in the same way it did with Nunzio. For example, the majority found the trial judge's questions to Juror Number 4 lacking. According to the majority, "[a]ll the judge said to Juror No. 4 was 'Tell me what happened,' and then 'Is this in any way going to affect your –'. To begin, neither of these are formulated as questions: the first is an open-ended directive, and the second was cut off." Maj. Op. at 23. Why would "[t]ell me what happened" elicit different information than phrasing it as a question? And so what if the second question was cut off? The "cutting off" was Juror Number 4's response of "No sir. Not at all." J.A. 191. The fair inference is that Juror Number 4 knew that the judge was going to ask if it would affect his ability to decide the case based solely on the evidence presented at trial The majority then lists follow-up questions the Maryland trial court should have asked. Maj. Op. at 23–24. Like a teacher correcting a student or a CLE seminar on the most thorough way to take a deposition, the majority literally announces the precise questions a court of a sovereign state should have asked if it was doing its job the way the all-knowing Fourth Circuit would do it. The majority also misreads the record when it faults the judge for acknowledging that "he could separate the jurors in twelve different rooms." Maj. Op. at 29. True, as an aside that sounds like sarcasm, the trial judge said "[u]nless I put them in 12 different rooms" before going on to something else. J.A. 196–97. Based on that comment, the majority states "this would have avoided the possibility that Juror No. 4 would share additional information, worsening any taint of the other eleven, and also ensure that the jury did not resume deliberations until the parties had resolved how to proceed. However, the judge chose not to do so." Maj. Op. at 29. The majority seems to imply that the trial judge should have put the jurors in twelve separate rooms. This is amazing. Nothing in the record suggests that separating the jurors into twelve different rooms was actually an option. How many courthouses have twelve unoccupied, free rooms in which to house jurors? And even if they did, why in the world would we suggest that was the right course. Do we need twelve bailiffs, too, one for each juror? I could go on, but hopefully these two examples make the point.

everything in the majority's opinion, Sweeney did not argue anything about structural errors. But even if Sweeney had made this argument, it would still fail.

"[M]ost errors do not automatically render a trial unfair and thus, can be harmless." *Sherman v. Smith*, 89 F.3d 1134, 1137 (4th Cir. 1996). But "certain structural errors are so severe as to render a trial inherently unfair and thus, should not be subject to harmless error analysis." *Id.* at 1138. "[T]he defining feature of a structural error is that it 'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.'" *Weaver,* 582 U.S. at 295 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991)). Critically, "[s]tructural errors affect the 'entire conduct of the trial from beginning to end,' and therefore cannot be harmless." *Sherman*, 89 F.3d at 1138 (quoting *Fulminante,* 499 U.S. at 309).

But we don't have a structural error here. "[A] juror site visit 'does not compare with the kinds of errors that automatically require reversal of an otherwise valid conviction.'" *Id.* (quoting *Rose v. Clark*, 478 U.S. 570, 579 (1986)). "Unlike the complete denial of counsel and other structural errors, which affect the 'entire conduct of the trial from beginning to end,' juror site visits can be discrete moments in the course of an otherwise fair trial." *Id.* Neither the majority nor Sweeney argue that the first four days of Sweeney's trial were problematic. So, *Sherman* forecloses the majority's argument.

How does the majority explain away *Sherman*? It says that *Sherman* is different because that case involved a "single error" from one juror rather than errors from the juror, counsel and judge. Maj. Op. at 45. This is a thin distinction. Even the errors the majority finds—which as I have explained are dubious conclusions—are still "discrete moments in

93

the course of an otherwise fair trial." *Sherman,* 89 F.3d at 1138 (quoting *Rose,* 478 U.S. at 579). What the majority finds fault with on the fifth day of trial does not "affect the 'entire conduct of the trial from beginning to end'" *Id.* (quoting *Fulminante,* 499 U.S. at 309).

The majority also relies on *Weaver* to find a structural error. There, the Supreme Court noted three ways errors have been deemed structural. "First, an error has been deemed structural in some instances if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest." *Weaver*, 582 U.S. at 295. The Court then gave the defendant's right to conduct his own defense as an example. *Id*. The supposedly infringed rights here are Sweeney's rights to an impartial jury and confrontation. Maj. Op. at 43. How in the world are those rights not designed to protect against erroneous conviction? How else is it that these rights are, as the majority quotes, "'the heart and lungs' of liberty[?]" Maj. Op. at 19 (quoting Letter from Clarendon to W. Pym (Jan. 27, 1766), *reprinted in 1 Papers of John Adams* 169 (R. Taylor ed. 1977)). The majority doesn't even attempt to enlighten us. Indeed, it doesn't even say what it thinks these rights are designed to do. The majority simply states its conclusion and moves on.

A second way *Weaver* said an error can be structural is when the "effects of the error are simply too hard to measure." *Weaver*, 582 U.S. at 295–96. The majority says that the failure to interrogate the remaining jurors means we cannot know whether the error was harmless. But again, based on the record evidence, there is no reason to think Juror Number 4 told them any details at all about his site visit. The majority then notes that it would be speculative to consider the effect of a twelfth juror—so what? Sweeney had the opportunity

94

for a new trial with twelve jurors and rejected it. Why would we speculate about the effect a twelfth juror would have?

"Third, an error has been deemed structural if the error always results in fundamental unfairness." *Weaver*, 582 U.S. at 296. The majority does not even attempt to conclude that this rationale fits. "We need not discuss this third rationale," the majority explains. Maj. Op. at 44.

So, the majority is left with hollow, unexplained distinctions from controlling caselaw regarding arguments that the majority itself made, giving neither the parties nor the state courts nor the district court an opportunity to pass upon them. One case the majority does not attempt to distinguish is *Greer v. United States*, 593 U.S. 503, 512, (2021). There, the Supreme Court reversed our *United States v. Gary*, 954 F.3d 194 (4th Cir. 2020) decision that the district court committed a structural error by failing to advise a defendant who pleaded guilty that, if he went to trial, a jury must find that he knew he was a felon. 593 U.S. at 507. The Supreme Court emphasized that structural errors are "highly exceptional" and that "discrete defects in the criminal process . . . are not structural." *Id*. Rather than following *Greer*'s guidance, the majority's unmoored structural error analysis here makes the same mistake.

III.

This is a straightforward AEDPA ineffective assistance of counsel case. Following established law, the outcome is clear—we must affirm the district court. Why then does the majority go to such tenuous lengths to order a new trial? No one else confessed to the

95

crime; no witness recanted; no new DNA evidence was discovered; no juror even came forward and said Juror Number 4 gave them information about his unauthorized field trip. Instead, one juror made a mistake that was quickly discovered and addressed. There is no indication there is an unjust result.

The majority says "[t]his case is extraordinary in its significant breakdown of the judicial process." Maj. Op. at 17. On that point, I agree. But the breakdown did not occur at trial. It occurs in this decision, in which the majority ignores the required standards of review, flouts Supreme Court precedent and precedent of this Court and litigates from the bench. I respectfully dissent.